Juanita POTTER, et al., Plaintiffs,

v.

WASHINGTON COUNTY, FLORIDA, et al., Defendants.

Juanita POTTER, et al., Plaintiffs,

v.

WASHINGTON COUNTY SCHOOL BOARD, et al., Defendants.

Nos. 86–2065, 86–2071.

United States District Court,
N.D. Florida,
Pensacola Division.

July 11, 1986.

H. Hentz McClellan, McClellan and House, P.A., Blountstown, Fla., for plaintiffs.

Gerald Holley, Chipley, Fla., for defendants.

## ORDER

VINSON, District Judge.

The plaintiffs have filed these actions, which are consolidated for the purpose of this order, alleging that the current at-large election system employed in Washington County for the purpose of electing county commissioners and county school board members violates the Voting Rights Act of 1965 ("Voting Rights Act"), Title 42, *United States Code,* Section 1973, et seq., as amended. Specifically, the plaintiffs claim that the at-large system of electing county-wide officials in Washington County impermissibly dilutes the voting strength of black individuals which, in turn, limits the opportunity for blacks to participate in the political process and elect representatives of their choice. [42 U.S.C. § 1973(b) ] In their complaints, the plaintiffs seek declaratory and injunctive relief, specifically requesting that Washington County be divided into five single member districts that will enhance the participation of blacks in the electoral process.

After filing the complaints in each of these cases, the plaintiffs sought class certification, pursuant to Rule 23(b)(2), Federal Rules of Civil Procedure. The defendants in both cases consented to class certifi-

cation. On May 15, 1986, and June 25, 1986, I entered orders certifying these cases as class actions, wherein the plaintiff classes consist of all black residents of Washington County, Florida, who are either registered to vote or eligible to register to vote. (Docs. 9, 12) Subsequently, the parties submitted to the Court proposed consent judgments, in which the defendants admitted liability under the Voting Rights Act. The parties were ordered to submit to the Court proposed single-member district plans, which would comply with the Act and with the Constitution.

The parties submitted proposals to the Court on June 24, 1986. On June 25, 1986, I held a hearing, the purpose of which was to provide the parties with an opportunity to present evidence and argue the merits of their proposed redistricting plans. The parties then requested that the Court select one of the three submitted plans, which would be submitted to the public in order that those persons so entitled would have an opportunity to object at the fairness hearing to be scheduled at a later date. [Fed.R.Civ.P. 23(e) ]

## I. WASHINGTON COUNTY DEMOGRAPHICS AND CURRENT ELECTORAL SYSTEM.

Washington County is a predominantly rural county located in Northwest Florida. According to the 1980 decennial census, upon which both parties have relied, the population of Washington County is 14,509. Of that number, 12,083 individuals are white, and 2,282 (15.7%) are black. As of 1980, there were 10,203 persons, age 18 and over, in the county, of whom 1,335 (13.1%) were black. The remaining population consists of American Indians and people of Asian and Spanish origin.[1] Blacks,

1. The defendants attempted to update the population figures by utilizing the figures provided by a manual entitled *Florida, County Comparisons, 1985,* which is published by the Bureau of Economic Analysis, Division of Economic Development, Florida Department of Commerce. According to the defendants, this manual indicates that the total Washington County population in 1984 was 14,860, of which 12,631 were white and 2,229 (15.0%) were black. The defendants then performed their own analysis in

order to check the accuracy of the figures provided by the Florida Department of Commerce. In their analysis, the defendants utilized the percentages of voters registered, as well as other figures provided by the Supervisor of Elections, and estimated the population of each voter precinct in Washington County. The defendants' proposed single-member districting plans are based on these updated estimates. I note, however, that the percentage of blacks in the population of Washington County is virtually the

therefore, constitute approximately 15.7% of the total population, approximately 13.1% of the voting age population, and approximately 12% of the registered voters, of Washington County. According to both the plaintiffs and the defendants, the black population in Washington County may be found primarily in three geographic areas: (1) the Chipley area, located in the northeast section of the county; (2) the Vernon-Redhead area, located in the center and the southwest of the county; and (3) the Caryville area, located in the extreme northwest part of the county.[2] These three geographic areas are so separated that there is no practical way to combine the black population within one district, and none of the three plans submitted attempt to do so.

The current system of electing both school board members and county commissioners in Washington County is prescribed by Chapters 100, 124, and 230, *Florida Statutes* (1985). Briefly, those sections require that there be five county commissioners and five school board members to serve Washington County. For the purposes of elections, the county is divided into five districts, numbered one through five. A district's county commissioner and a district's school board member are required to live in the district he or she represents. In Washington County, the school board district lines and the county commission district lines coincide. County commissioners and school board members are elected at the general election held in November of each even year and serve staggered terms of four years. While the commissioners and school board members must reside within the district he or she represents,

elections are held on a county-wide or at-large basis. Each qualified elector of the county is entitled to vote for one candidate from each district for which elections are being held that year. Ordinarily, the election of the county commissioners and school board members is determined by the political party primary elections. [§ 100.061, *Fla.Stat.* (1985)] If a candidate receives a majority of the votes cast in the first primary, that candidate moves on to the general election. If no candidate receives a majority in the first primary, the two candidates receiving the highest number of votes run again, in the run-off primary election. [§ 100.091, *Fla.Stat.* (1985)] The candidate from each district receiving the highest number of votes in the general election is elected to the board of county commissioners or the school board and is not required to receive a majority of the votes cast. [§ 100.181, *Fla. Stat.* (1985)]

## II. THE DISTRICTING PLANS.

A. *The plaintiffs' plan.* The plaintiffs have submitted a single-member district plan based on 1980 census data. The proposal divides Washington County into five single-member districts for use in both county commissioner and school board elections. Under the plan, each incumbent representative will remain in his current district. According to the figures provided by the plaintiffs, Washington County would be divided into five districts with the following demographics: [3]

same whether one uses the 1980 census or the defendants' 1984 population estimates. The parties also agree that the registered black voters numbered 1128 in 1984, or approximately 12% of the total registered voters of Washington County. Consequently, when discussing the parties' proposals, *infra*, I am cognizant that the plaintiffs and the defendants are relying on slightly different population data. The difference, however, is *de minimus* and of no consequence to my findings and conclusions.

2. The plaintiffs have considered the Vernon-Redhead area as two separate geographic regions.

3. I note that the plaintiffs have computed the black population in Washington County to be 16.72%. This figure is in error, however, because it includes 144 individuals who are minorities, but not blacks. These individuals do not fall within the certified class and should not have been considered in the plaintiffs' calculations. It is impossible for me to determine to what extent the plaintiffs' miscalculation has affected the statistics for each individual district proposed in their plan.

| District | Population | Variance from Norm[4] | %Black |
|----------|-----------|----------------------|--------|
| 1 | 3116 | +7.4% | 10.3% |
| 2 | 2747 | −5.35% | 1.8% |
| 3 | 3043 | +4.86% | 55.8% |
| 4 | 2789 | −3.9% | 3.0% |
| 5 | 2814 | −3.04% | 9.5% |

As is indicated by the demographics, the plaintiffs' district (3) has a majority black population. In addition, the plaintiffs claim that blacks comprise the majority of eligible voters in that district (51%), which, assuming racially polarized voting, would better enable blacks to choose a representative of their choice consonant with the Voting Rights Act [42 U.S.C. § 1973(b)]. In order to implement their plan immediately, the plaintiffs also suggest that the term of the incumbent school board member from district (3) [defendant Hightower] should be reduced to two years. Voters in district (3), therefore, would elect a school board member in 1986 and every four years thereafter.

Geographically, the plaintiffs' district (3) extends diagonally from the southwest corner of the county to Chipley, the county's largest community (population 3,330) and its county seat, located in the northeast corner of the county. The northwest side of district (3) also cuts through Vernon (population 885), which is located in the middle of the county. As proposed by the plaintiffs, district (3) excludes Ebro (estimated population 233), which is currently included in existing district (3). The remaining districts (1), (2), (4), and (5) are adjusted to compensate for the population changes resulting from the new district (3). Aside from the substantial alterations of existing district (3), however, the plaintiffs' proposal does not appear to significantly change the district boundaries of the remaining districts. The plaintiffs contend that the creation of new district (3) in the

manner proposed is necessary to ensure that blacks in Washington County will be able to elect a candidate of their choice on both the board of county commissioners and the school board. Also, without much discussion, the plaintiffs assert that their proposal "minimizes" the effects of redistricting.

B. *The defendants' plans.* The defendants have submitted two proposed single-member district plans for my consideration. Each plan creates five contiguous single-member districts based on the updated population estimates discussed *supra,* note 1. Both the Washington County Commissioners and the Washington County School Board members are in agreement as to the proposals. In addition, both entities have stated that they have identical priorities with respect to ranking the two plans.

(1) *Defendants' plan (A).* The defendants' preferred plan, referred to here as defendants' plan (A), divides Washington County into five single-member districts with the following demographics:

| District | Population | Variance from Norm[5] | %Black[6] |
|----------|-----------|----------------------|-----------|
| 1 | 2898 | −2.5% | |
| 2 | 3313 | +11.47% | |
| 3 | 2668 | −10.23% | |
| 4 | 3012 | +1.34% | 36.5% |
| 5 | 2968 | −0.14% | |

Under defendants' plan (A), district (4) is the "minority" district, with 36.5% of the population within that district being black. The defendants readily acknowledge that plan (A) does not contain any district in which blacks comprise a majority of the population (or a majority of those eligible to vote). However, they note that black voter strength, as a function of overall population in district (4), is substantially greater than overall black voter strength

---

**4.** In accordance with the one person, one vote requirement, each of the districts should ideally contain an equal population. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1962); *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151 (5th Cir.1981). With a total population of 14,509, the norm for each district would be 2,902.

**5.** Using the defendants' total estimated population of 14,859, the norm for each of the five districts is 2,972.

**6.** The defendants only provided the percentage of blacks in the district in which they comprised the greatest percentage --- district (4) under plan (A).

currently existing under the at-large system, or in any separate currently-existing district, in Washington County. In addition, the defendants have noted in their memoranda submitted to the Court, and through the testimony of Albert Davis at the hearing, that the historical voting in Washington County has not been severely polarized on the basis of race. While this evidence was purely anecdotal, the plaintiffs have not disagreed or introduced any evidence to the contrary.

Geographically, defendants' plan (A) appears to preserve many of the existing district boundary lines. The most significant alteration affects existing district (4), which, under defendants' plan (A), relinquishes territory to districts (2) and (5). Additionally, the western boundary of proposed district (3) coincides with Holmes Creek, a major waterway. Unlike the plaintiffs' proposal, defendants' plan (A) does not divide the town of Vernon. Rather, the entire town is included within proposed district (3). Defendants' plan (A) does divide Chipley. Unlike the plaintiffs' proposal, however, Chipley is divided into two districts under the defendants' plan, rather than three districts as in the plaintiffs' plan.

(2) *Defendants' plan (B).* The defendants' second-ranked plan, referred to here as defendants' plan (B), also divides the county into five single-member districts with the following demographics:

| District | Population | Variance from Norm | %Black |
|---|---|---|---|
| 1 | 2898 | –2.5% | |
| 2 | 2997 | +0.84% | |
| 3 | 3219 | +8.31% | 50.9% |
| 4 | 2877 | –3.2% | |
| 5 | 2868 | –3.5% | |

Under defendants' plan (B), district (3) would be the "minority" district with a population in which 50.9% would be black. This plan is quite similar to the plaintiffs' proposal; however, defendants' proposed district (3) contains the entire town of Vernon, as well as Ebro, which is located in the southwest corner of Washington County. According to the defendants, Ebro and Vernon have traditionally been located within the same district. While the defendants recognize that plan (B) further enhances the voting strength of blacks in the county, they also note that plan (B) lacks the qualities of compactness and preservation of traditional political boundaries. Plan (B) does, however, comply quite closely with the requirement of one person, one vote set forth in *Reynolds v. Sims, supra* note 4, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

## III. CONCLUSIONS.

Upon very careful consideration of each of the plans submitted to me in these cases, and fully cognizant of the aims of the Voting Rights Act, it is my determination that defendants' plan (A) should be implemented in Washington County for the purposes of electing members to the Washington County Board of County Commissioners and the Washington County School Board. In reaching this decision, I am guided by some fundamental principles involving the right to vote and the proper role of the federal courts in helping to secure that right.

First, it must be recognized that defendants' plan (A) is not a court ordered plan, where equitable considerations would require close scrutiny and the fashioning of a nearly optimal apportionment plan. *See, e.g., City of Mobile v. Bolden,* 446 U.S. 55, 66 n. 12, 100 S.Ct. 1490, 1499 n. 12, 64 L.Ed.2d 1012 (1982). It is true that by the terms of the consent judgment, the parties were ordered to submit proposals for my consideration. However, the fact that the reapportionment plans were submitted in response to a court order does not change the character of the defendants' plans. It is clear that, under the interpretation of the United States Supreme Court, both defendants' plan (A) and plan (B) are legislative plans, submitted by entities whose basic function is to make decisions of political policy. *See McDaniel v. Sanchez,* 425 U.S. 130, 144, 101 S.Ct. 2224, 2233, 68 L.Ed.2d 724 (1981). *See also Seastrunk v. Burns,* 772 F.2d 143, 151 (5th Cir.1985); *McMillan v. Escambia County,* 559 F.Supp. 720, 723–24 (N.D.Fla.1983) *on remand from* 688 F.2d 979 (5th Cir.1982) (apportionment plan submitted by legislative body entitled to

deference, regardless of whether legislative body has power to enact such plan).

My conclusion that the defendants' plans are legislative has a profound effect on the nature of my review. It is manifestly clear that I cannot substitute my judgment for that of either the Washington County Board of County Commissioners or the Washington County School Board, two legislative bodies who, in submitting their proposals to this Court, are exercising the will of the people of Washington County. However, the deference to which I must afford the defendants' plans is not boundless. As stated by the Supreme Court of the United States, "[t]he only limits on judicial deference to state apportionment policy ... [are] the substantive constitutional and statutory standards to which such state plans are subject." *Upham v. Seamon*, 456 U.S. 37, 42, 102 S.Ct. 1515, 1521, 71 L.Ed.2d 725 (1982) [citing *White v. Wiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973)]. Thus, I turn now to defendants' plan (A) and measure that plan against the substantive requirements of federal law.[7]

(A) *Constitutionality of defendants' plan (A).* Contrary to a violation of the Voting Rights Act, which may be premised on proof that an apportionment plan has the *result* of disenfranchising minorities, a constitutional violation may be found only where there is proof of a discriminatory purpose in either formulating or maintaining the plan, and some differential impact, such as the dilution of the minority's voting strength. *Rogers v. Lodge*, 558 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *NAACP v. Gadsden County School Board*, 691 F.2d 978, 980–81 (11th Cir. 1982). Here, the defendants have admitted in the consent judgments that the existing at-large voting system discriminates against blacks. In light of binding precedent in this circuit regarding the Florida system of at-large county elections, the de-

fendants' admission of liability is merely an inevitable acknowledgement of the existing status. *See, e.g., NAACP v. Gadsden County School Board, supra,* 691 F.2d at 982; *McMillan v. Escambia County,* 638 F.2d 1239, 1245–46 (5th Cir.1981) (Florida Legislature's change from single-member districts to at-large voting in 1947 made with invidious purpose to dilute growing strength of black vote). However, in admitting that the existing at-large system is violative of the Constitution, the defendants are not also admitting that they must, under the Constitution, establish at least one district in which blacks constitute a majority of the voters. Rather, under the circumstances of this case, it is incumbent on the plaintiffs to introduce evidence that either or both of the defendants' submitted plans were formulated with a discriminatory purpose.

The plaintiffs have argued in their memorandum that defendants' plan (A) is inherently discriminatory in that it fails to establish a district in which blacks constitute a majority of the voters. However, as will be discussed more fully in the context of the Voting Rights Act, the fact that defendants' plan (A) does not provide a district in which the majority of the voting population is black is not, under the facts of this case, sufficient evidence to establish a discriminatory purpose on the part of the defendants. I find, therefore, that defendants' plan (A) was not formulated with a discriminatory purpose and is not violative of the Constitution.

(B) *Defendants' plan (A) under the Voting Rights Act.* In the consent judgments entered herein, the defendants admit that the existing at-large election system in Washington County violates Section 2 of the Voting Rights Act. [42 U.S.C. § 1973(a), (b) ] Specifically, the judgments acknowledge that the at-large system "minimizes and cancels out black voting

---

7. My inquiry is limited not only by principles of judicial deference to legislative judgments, but also by the minimum amount of evidence submitted by the parties. At the hearing held on June 25, 1986, neither side really presented evidence in support of their respective plans; nor did either party introduce any evidence in opposition to their adversary's proposals. Rather, each side generally argued the merits of their plans as presented to the Court by way of memoranda the previous day. Consequently, I am constrained to judge the legality of defendants' plan (A) primarily on the basis of the data provided by the parties before the hearing.

strength," which, in turn, deprives blacks of an equal opportunity to participate in the county's political processes. The question presented at this point, therefore, is whether defendants' plan (A) violates the Voting Rights Act by impermissibly diluting the strength of the black vote in Washington County. For the following reasons, I find that it does not.

Defendants' plan (A) contains a district (district 4) in which blacks comprise 36.5% of the population of the district. The plaintiffs argue that this plan does not remedy the existing situation in Washington County because it fails to provide at least one district in which blacks would comprise more than 50% of the eligible voters. Initially, it must be noted that the defendants' figure of 36.5%, which I assume to be the percentage of all blacks in district (4), is only partially helpful in my determination. In *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1162 (5th Cir.1981), the court held that voting age population, rather than the percentage of registered voters or the percentage of minorities in general, is perhaps the most significant factor in determining voter dilution. Thus, a more relevant figure for determining voter strength would be the percentage of blacks eligible to vote in district (4). Neither of the parties has provided me with this figure.[8] The defendants state in their memorandum that 71.1% of the total county population is age 18 and over and, thus, eligible to vote. This figure, however, does not account for the difference that the plaintiffs claim exists between the percentages of whites and blacks who are over the age of 18 years. According to the plaintiffs, 73% of whites are of voting age in Washington County, while only 60% of the black population is of voting age. Using the plaintiffs' percentages, it can be calculated that approximately 32.1% of the eligible voters in district (4) of defendants' plan (A) are black.[9] Therefore, I find that an approximate percentage of 32.1% better reflects the black voting strength in proposed district (4).

The key operative inquiry, then, and the real issue presented here, is whether an apportionment plan that does not provide a district in which blacks constitute the majority of the potential voting strength is an impermissible remedy under the Voting Rights Act.[10] I find that the plaintiffs' argument against the defendants' plan (A) misses the mark. First, although the defendants have admitted that the existing at-large system dilutes the voting strength of blacks, there is no provision in the Voting Rights Act that minorities must be afforded proportionate representation on a legislative body. In fact, it expressly provides otherwise. *See* 42 U.S.C. § 1973(b) ("*Provided*, that nothing in this section es-

---

**8.** The plaintiffs have computed the percentage of eligible voters on the basis of race with respect to the minority district in the plan that they submitted. However, this is the only district for which such a figure has been computed.

**9.** District (4), as proposed, would contain 3012 people. Of these, 36.5%, or 1099, would be black. Of this black population, approximately 60%, or 659, may be assumed to be of voting age. Similarly, of the 1912 whites in district (4), approximately 73%, or 1396, may be assumed to be of voting age. These computations are made on the basis of the figures provided by both parties. It should be clear, however, that these are only approximations.

**10.** On June 30, 1986, the Supreme Court decided *Thornburg v. Gingles,* —— U.S. ——, 106 S.Ct. 2752, 92 L.Ed.2d 25 (U.S.1986), in which the majority addressed the specific question of whether "the use in a legislative redistricting plan of multimember districts in five North Carolina legislative districts violated § 2 [of the Voting Rights Act, 42 U.S.C. § 1973] by impairing the opportunity of black voters 'to participate in the political process and to elect representatives of their choice.'" *Id.* 106 S.Ct. at 2760. In *Thornburg,* the Court specifically addressed the elements of proof necessary for plaintiffs to succeed in a voter dilution claim. However, the Court expressly limited its decision to the effect that multimember districts may have on minority voting strength. *Id.* at 2764–65 n. 12. Nevertheless, as recognized by Justice O'Connor in her opinion concurring in the judgment, the guidelines articulated by the majority relating to multimember districting are likely applicable in cases where other electoral systems, such as an at-large system, are challenged on the basis that they dilute the strength of the minority vote. *Id.* at 2758 (O'Connor, J., concurring in the judgment). Consequently, I will refer to *Thornburg* in this order where appropriate.

tablishes a right to have members of a protected class elected in numbers equal to their proportion in the population.").

Second, and closely related to the first point, the percentages provided by the parties in this case differ widely from the percentages of minority populations in cases where the courts have found the remedy proposed here by the plaintiffs to be appropriate. It can be seen in the cases cited in the consent judgment, and in any number of other cases arising under the Voting Rights Act, that the percentage of minorities in the overall population translated, on a proportional basis, into at least one potential minority representative on the legislative body. *See, e.g., Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) (25% black population in Dallas; 8 single-member and 3 at-large councilmen); *McCord v. City of Ft. Lauderdale,* 787 F.2d 1528 (11th Cir.1986) (blacks comprised 21% of city population; 5 member city council); *Seastrunk v. Burns,* 772 F.2d 143 (5th Cir.1985) (12.4% black population; 12 member school board); *United States v. Marengo County Commission,* 731 F.2d 1546 (11th Cir.1984) (48.7% black in voting age population; 5 member county commission and 5 member school board); *NAACP v. Gadsden County School Board, supra* (59% black population in county; 5 member school board); *McMillan v. Escambia County,* 638 F.2d 1239 (5th Cir.1981) (20% black population; 5 member county commission); *Jenkins v. City of Pensacola,* 638 F.2d 1249 (5th Cir. 1981) (33% black in City of Pensacola; 10 member city council); *Calderon v. McGee,* 584 F.2d 66 (5th Cir.1978), *modified on rehearing,* 589 F.2d 909 (1979) (28% minority population, 5 single-member and 2 member at-large school board); *Kirksey v. Board of Supervisors of Hinds County,* 554 F.2d 139 (5th Cir.1977) (en banc) (39.1% black population; 5 member board of supervisors); *State of Mississippi v. United States,* 490 F.Supp. 569 (D.D.C.1979) (31.5% black in voting age population; state senate consisted of 52 members and state house consisted of 122 members). Unlike the situation found in the cases cited above, the percentage of blacks in Washington County does not even translate to one minority representative on the board of county commissioners or the school board.[11] According to the 1980 statistics, blacks in Washington County represent 15.7% of the general population, and 13.1% of the voting age population. The board of county commissioners and the school board, however, each has only five members. If I were to select the plaintiffs' proposal, I would be implementing a single-member redistricting plan that would virtually guarantee a black representative on both legislative bodies, assuming polarized voting. In practical terms, blacks would be given a right to have members elected to 20% of the available positions, a representation considerably in excess of the blacks' proportionate share of either the general population or the voting age population of Washington County. *See Thornburg v. Gingles, supra* at n. 10, (O'Connor, J., concurring in the judgment) [A measure of "undiluted" minority voting strength is necessary to evaluate any claim of voter dilution. Justice O'Connor suggests that one appropriate measure would be to focus on the percentage of minorities in the overall voting age population in order to determine proportional representation. In a slightly different context, she questions whether there should not be a "threshold requirement" of showing that the minority group constitutes a majority in a single-member district. *Id.* 106 S.Ct. at 2758 n. 1.] Absent controlling authority requiring me to fashion such an affirmative remedy, I decline to do so.

**11.** I recognize that my discussion of proportionate representation assumes that the representative chosen by a minority would be of the same race as the minority electorate. This would not necessarily be the case; however, the phenomenon of racially polarized voting is the "keystone" to any dilution case, and is implicitly recognized by courts approving apportionment plans that provide for at least one district in which blacks constitute a majority of the voting age population. *See United States v. Morengo County Commission, supra,* 731 F.2d at 1566; *McCord v. City of Ft. Lauderdale, supra,* at 1537 (Swygert, J., dissenting) (position of civil rights bar appears to be that blacks alone are qualified to represent other blacks).

In order for me to find a violation of the Voting Rights Act, defendants' plan (A) must result in a *discriminatory* dilution of black voting strength. Rather than diluting the voting strength of blacks, however, the defendants' plan *enhances* their voting strength. While defendants' plan (A) admittedly does not contain a district in which blacks will be almost assured to elect a representative of their choice, district (4) does provide blacks with the opportunity to exert a voting influence within one district that far exceeds either their county-wide representation, or their representation currently existing within any district. *See Thornburg v. Gingles, supra* n. 10, (O'Connor, J., concurring in the judgment) [In evaluating presence or absence of minority electoral success, the court should be cognizant that "the power to influence the political process is not limited to winning elections," citing *Davis v. Bandemer*, — U.S. ——, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).] The inability of blacks to have a majority of voters within at least one district is a function of both the wide geographic dispersion of the black population and the relatively low proportion of blacks to the general population. For example, it would not be theoretically possible to create a black majority district among five districts if blacks constituted less than 10% of the general or voting age population — even if they were all located in one compact area of the county. When the percentage of the voting age population (13.1%) is only slightly larger than the critical 10% level,[12] and when the minority group is widely dispersed, it becomes practically impossible to create such a district and still abide by other apportionment principles. I find that the effect of dilution must be measured against the voting-age benchmark of 20% (for a 5–member commission or board); at or above that point, the court should attempt to fashion a remedy that provides a black majority district, but it should be a decreasing concern as the percentage of voting age population drops below 20%. As that percentage reaches 10%, or below, it should not even be considered. This approach is consistent with *Thornburg v. Gingles, supra* n. 10, in which the Supreme Court held that, as a necessary precondition to a voter dilution claim, the minority group must "be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district." *Id.* 106 S.Ct. at 2766. Here, in addition to being dispersed throughout Washington County, the black population does not constitute a percentage of the voting-age population "numerous enough to command at least one seat." *Whitcomb v. Chavis*, 403 U.S. 124, 156, 91 S.Ct. 1858, 1875, 29 L.Ed.2d 691 (1971).

In the consent judgments, the defendants have admitted that the at-large system in Washington County violates the Voting Rights Act.[13] However, due to the relatively small percentage of black population in the county, I question whether a historic lack of black representatives on the school board or the county commission is totally a function of the at-large system. It would appear to be, at least in part, the result of the fact that the total number of blacks in the county does not equate to even one seat on those elected bodies when considered proportionately. I find, in consideration of all the factors set forth above, that defendants' plan (A) does not have the effect of diluting the black vote in Washington County.

(C) *Other factors.* Finally, in approving defendants' plan (A), I have taken into consideration a number of additional factors that relate to apportionment plans. First, under *Reynolds v. Sims, supra,* the one person, one vote principle requires that vot-

---

12. Obviously, the critical level will depend upon the number of districts or positions. For a 7–member system, the critical level would be 7.143%, etc.

13. There has to be a finding of liability in order for this court to order a change from an at-large system to single-member districting. Otherwise, the county would be required to place the issue before the electorate in the form of a referendum under Florida law. *See* § 124.011, *Fla. Stat.* (1985); § 230.105, *Fla.Stat.* (1985).

ing districts include approximately an equal number of voters so that the weight of each person's vote will be substantially identical. When an apportionment plan is fashioned by a legislative body, population deviations of 10% and under are considered to be prima facie constitutional. *Connor v. Finch,* 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977). Defendants' plan (A) contains one district (district 2) in which the population deviates from the norm by ( + )11.47%. In addition, district (3) deviates by ( — )10.23%. Although districts (2) and (3) do not adjoin each other so that these deviations could be readily equalized, the defendants have not explained why these deviations exist.[14] Otherwise, the remaining districts deviate from the norm by less than 3%. I find that, while defendants' plan (A) does not provide the ideal under the one person, one vote rule, any deviations are justified by the defendants' apparent efforts to maintain a degree of compactness and commonality of interests within each district. *See, e.g., Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1972) (16.4% deviation approved).

Defendants' plan (B) and the plaintiffs' plan both adhere more precisely to the one person, one vote principle, but both suffer from unacceptable "gerrymandering" by creating a minority district that arbitrarily cuts diagonally through the center of the county. In each of these plans, the predominantly black section of east Chipley is attached to the traditional district (3) by a long, narrow corridor. The effect of this is to create a geographic dragon-shaped area, with a small head and a long neck; a classic "gerrymander." Both of these plans sacrifice the important concerns of compactness and preservation of traditional, historic boundaries.

As mentioned above, defendants' plan (A) best serves to create districts that are compact, contiguous, and that preserve natural, political, and traditional boundaries. *See Wyche v. Madison Parish Police Jury, supra,* 635 F.2d at 1163. These factors are important and must be considered in assessing an apportionment plan. *Id.* In addition, the defendants state in their memorandum that plan (A) preserves the commonality of interests currently existing among and within communities of Washington County. For example, Chipley is the only sizable community lying within proposed district (4), as is consistent with tradition. The plaintiffs' plan and defendants' plan (B), however, include a large part of Chipley and all of Vernon within the same district. According to the defendants, these communities do not share the same interests and, in fact, may be antagonistic. While there is no evidence of this in the record beyond the assertion made in the defendants' memorandum, neither have the plaintiffs challenged this claim, either at the hearing or otherwise. I note also that under the plaintiffs' plan, Chipley is divided into three separate districts. Such a division of a relatively small town seems unwarranted, and could result in as many as 60% of the representatives (3 of 5) being from Chipley, to the detriment of the large rural areas and small communities.

Also, there is some question about how the Court can "maximize black voting strength in Washington County," as provided in paragraph (7) of the consent judgment. I suppose that, in theory at least, a district could be created to encompass the Caryville area, the east Chipley area, and the Vernon-Redhead area ___ thereby incorporating all of the primary black population areas of the county and literally maximizing black voting strength. Such a district could not be compact or contiguous, and probably would have to be geographically fragmented (like the former East Pakistan). Therefore, I do not construe "max-

---

14. It would appear that some minor boundary changes could be made to districts (2), (3), and (5) that would alleviate these deviations, without any significant change in the compactness or commonality of interests. However, I have only had three plans submitted and must evaluate each as submitted.

imize" as standing alone, but, instead, as providing for maximization consistent with other apportionment principles. In *Thornburg v. Gingles, supra* at n. 10, Justice O'Connor's concurring opinion notes that a court "would often face hard choices about what would truly 'maximize' minority election success." 106 S.Ct. at 2787. She concludes, as does the majority opinion, that if the minority group is not large enough, or geographically concentrated enough, or politically cohesive enough, then maximization does not mean insuring the election of a minority member in voter dilution analysis. That is the situation here: the minority group is not large enough or geographically concentrated enough to implement a plan that does anything more than maximize the group's *influence* in the elections. Maximization, under this scenario, cannot mean a requirement of a district having a majority of black voters.

In sum, I find that defendants' plan (A) does not violate the constitution, does not abridge the rights of the class members under the Voting Rights Act, and complies with the principle of one person, one vote, while maintaining a sufficient degree of compactness and contiguity by utilizing natural and traditional boundaries to the best extent possible. In addition, the plan preserves the historic political and community boundaries in Washington County. Accordingly, it is ORDERED as follows:

(1) The defendants' plan (A) is hereby adopted as the apportionment plan for Washington County, effective for 1986 and subsequent elections of members of the board of county commissioners and the school board.

(2) The district boundaries established by the adopted plan shall be promptly promulgated and incorporated into the notice to be published regarding a Rule 23 fairness hearing.

(3) This Court shall set the Rule 23 fairness hearing on a date and at a place to be agreed upon by the parties and submitted to the Court.

(4) The Court reserves jurisdiction to determine the remaining issues herein, including attorney fees and taxable costs.