**EAST JEFFERSON COALITION FOR LEADERSHIP AND DEVELOPMENT, et al.**

v.

**The PARISH OF JEFFERSON, et al.**

**Civ. A. No. 86–3668.**

United States District Court,
E.D. Louisiana.

July 12, 1988.

---

J. Anthony Moscona and Robert Schambach, Metairie, La., Ronald L. Wilson, Alice Jacobs, New Orleans, La., for plaintiffs.

Harry A. Rosenberg, John P. Manard, Jr., New Orleans, La., for defendants.

Anthony S. Taormina, Metairie, La., pro se.

## MEMORANDUM DECISION

BEER, District Judge.

Plaintiffs, the East Jefferson Coalition for Leadership and Development, the Lincoln Manor Civic Association, and a number of registered voters in Jefferson Parish brought suit against the Parish of Jefferson alleging that the current plan for apportioning the seats on the Jefferson Parish council violates § 2 et seq. of the Vot-

ing Rights Act of 1965, as amended in 1982. 42 U.S.C. § 1973 et seq. Plaintiffs also contend that the present apportionment plan violates their rights under the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1983.

This court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1973 and 1973j(f).

## I Introduction

In January 1986, a number of Jefferson Parish registered voters filed suit alleging that the structure of the Parish councilmanic districts violated the one-man, one-vote principle established in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *Cedric Floyd v. Parish of Jefferson,* C.A. 86–0265 (E.D.La.) That suit terminated with a consent decree signed by the plaintiffs, defendants and this court on June 22, 1987. (Plaintiffs' Exhibit # 3). The consent decree ordered the Parish "to more evenly distribute the population of the Parish of Jefferson among its four councilmanic districts." *Id.* The Parish council proceeded to amend its Home Rule Charter and reapportion the councilmanic districts in accordance with the mandates of the consent decree. That reapportionment plan reflects the districts

as they are currently drawn and is the subject of this lawsuit.

■ The Parish submitted the plan to the United States Attorney General for approval in accordance with § 5 of the Voting Rights Act. 42 U.S.C. § 1973c. Over the opposition of the plaintiffs in this suit and a number of their experts, the Attorney General indicated that he would not interpose any objection to the proposed redistricting plan.[1] (See, Defendants' Exhibits #'s 7, 8, 9, 10, and 11). The Parish elected a new council in November 1987 under the current plan. Those elections are valid and shall stand, notwithstanding this decision which questions the validity of the present apportionment plan.

Jefferson Parish is sought to be governed by a seven-member council. The council members are elected through a combination of single-member, floaterial, and at-large districts.[2] The Parish is apportioned into four districts. Each district elects one councilman. One member is elected at-large from Districts 1 and 2. One member is elected at-large from Districts 3 and 4. The seventh councilman, the Chairman, is elected from the Parish at-large. The consent decree did not alter this three level election scheme. It only required that the Parish reapportion the four single member districts to bring it into compliance with *Reynolds v. Sims.* Jefferson Parish utilizes a majority vote requirement in its councilmanic elections.[3]

1. Approval by the Attorney General does not foreclose a claim against the plan under § 2. See, *Martin v. Allain,* 658 F.Supp. 1183, 1200 (S.D.Miss.1987), *Gingles v. Edmisten,* 590 F.Supp. 345, 375–376 (E.D.N.C.1984), *aff'd in part, rev'd in part, Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

2. Jefferson Parish is the only parish in Louisiana which uses a combination of three types of districts to elects its council. Six parishes use a combination of single-member and some other type of district. They are: Concordia (9 districts—3 single-member, 6 multi-member), Orleans (7 districts—5 single-member, 2 at-large), St. Charles (9 districts—7 single-member, 2 at-large), St. John the Baptist (9 districts—7 single-member, 2 floaterial), St. Mary (11 districts—8 single-member, 3 at-large), and West Baton Rouge (9 districts—5 single-member, 4 multi-member). The remaining parishes use all single-member districts to elect their governing bodies. (Plaintiffs' Exhibit # 7).

3. Section 2.03(B) of the Home Rule Charter provides that the Parish shall hold councilmanic elections every four years in accordance with the state election laws. Louisiana does not explicitly require that candidates receive a majority of votes to win election. Louisiana Revised Statute § 18:512(A) states that the candidate receiving the most votes cast in a general election is elected. The number of candidates who may qualify for a general election, however, is restricted to twice the number of positions the election seeks to fill. LA.REV.STAT. § 18:482. A candidate can win election from the primary if he wins a majority of votes cast in that election. LA.REV.STAT. § 18:511. Otherwise, only the two candidates with the highest vote counts advance to the general election in accordance with § 18:482. Thus, since only two candidates can advance to the general election, the winner necessarily must receive a majority of the votes cast in that election. This is not a strict majority vote requirement, because if there is a tie

According to the 1980 census, Jefferson Parish has a total population of 454,592 persons and a black population of 63,001. (Plaintiffs Exhibit # 5B). The voting age population is 314,323 persons, of whom 268,878 are white and 37,039 are black. (Defendants' Exhibit # 20). There are 197,376 registered voters in the Parish of whom 23,381 are black. (Plaintiffs' Exhibit # 5B).[4] No black has been elected to the Parish council.

## II *The 1982 Amendments to the Voting Rights Act*

In 1982, Congress amended § 2 of the Voting Rights Act "to clearly establish the standards ... for proving a violation of that section." S.REP. NO 97–417, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S. CODE CONG. & ADMIN.NEWS 177, 178 (hereinafter S.Rep.).

Section 2, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to the participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis provided).

Any electoral mechanism which dilutes the voting strength of a minority group is as impermissible a denial of the right to have one's ballot count fully, as the denial of the right to vote. S.Rep. at 28, 1982 U.S.CODE CONG. & ADMIN.NEWS at 205. The Voting Rights Act seeks to prevent political bodies from implementing

---

vote in the primary, § 18:483 allows all the candidates with the same number of votes to qualify for the general election if they otherwise would have qualified.

4. The population breakdown of Jefferson Parish under the challenged plan according to the 1980 census figures is as follows.

| District | Total | White (%) | Black (%) | Other (%) |
|---|---|---|---|---|
| 1 | 113,621 | 91,839(80.8%) | 18,398(16.2%) | 3,384(3.0%) |
| 2 | 113,557 | 83,954(73.9%) | 26,930(23.7%) | 2,673(2.4%) |
| 3 | 114,287 | 95,482(83.5%) | 16,518(14.5%) | 2,287(2.0%) |
| 4 | 113,127 | 109,370(96.7%) | 1,155(1.0%) | 2,602(2.3%) |
| 1 & 2 | 227,178 | 175,793(77.4%) | 45,328(20.0%) | 6,057(2.6%) |
| 3 & 4 | 227,414 | 204,852(90.0%) | 17,673(7.8%) | 4,889(2.2%) |
| Total | 454,592 | 380,645(83.7%) | 63,001(13.9%) | 10,946(2.4%) |

The number of registered voters in Jefferson Parish under the challenged plan as of July 2, 1987 is as follows.

| District | Total | White (%) | Black (%) | Other (%) |
|---|---|---|---|---|
| 1 | 45,425 | 38,346(84.4%) | 6,701(14.7%) | 378(.9%) |
| 2 | 48,317 | 37,335(77.3%) | 10,756(22.3%) | 226(.4%) |
| 3 | 48,808 | 43,039(88.2%) | 5,598(11.5%) | 171(.3%) |
| 4 | 54,826 | 54,308(99.1%) | 326(.6%) | 192(.3%) |
| 1 & 2 | 93,742 | 75,681(80.7%) | 17,451(18.6%) | 604(0.7%) |
| 3 & 4 | 103,634 | 97,347(93.9%) | 5,924(5.7%) | 363(0.4%) |
| Total | 197,376 | 173,028(87.7%) | 23,381(11.8%) | 967(0.5%) |

(See, Plaintiffs' Exhibit # 5B). Neither plaintiffs nor defendants have provided a distribution of

election systems or practices which operate, whether intentionally or not, to minimize, cancel, or dilute the voting strength or political effectiveness of minority groups.

■ Dilution of minority voting strength is caused by drawing district lines in such a way that the minority group constitutes an ineffective minority or by concentrating the minority group into districts where they are an excessive majority. *Thornburg v. Gingles,* 478 U.S. 30, 46 n. 11, 106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25 (1986). At-large and oversized voting districts possess the potential to minimize or dilute minority voting strength, and therefore, are subject to careful scrutiny.

At-large voting schemes and multimember districts tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district. A distinct minority, whether it be racial, ethnic, economic, or political group, may be unable to elect any representatives in an at-large election, yet be able to elect several representatives if the political unit is divided into single-member districts.

*Rogers v. Lodge,* 458 U.S. 613, 616, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982). See also, *Whitcomb v. Chavis,* 403 U.S. 124, 143–144, 91 S.Ct. 1858, 1869–1870, 29 L.Ed.2d 363 (1971) (the Court acknowledged that large districts tend to cancel out or minimize minority voting power, especially if there is no provision to elect members from particular geographic subdistricts). Neither the courts nor the legislature, however, have unequivocally determined that all at-large or oversized districts tend to dilute a minority group's voting rights, and therefore, they are not per se unlawful. *Rogers,* 458 U.S. at 617, 102 S.Ct. at 3275, *Mobile v. Bolden,* 446 U.S. 55, 66, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980), *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973), *Whitcomb v. Chavis,* 403 U.S. 124, 142, 91 S.Ct. 1858, 1868, 29 L.Ed.2d 363 (1971), *Zimmer v. McKeithen,* 485 F.2d 1297, 1304 (5th Cir.1973), *aff'd sub nom,*

the voting age population in the present dis-

*East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed. 2d 296 (1976), S.Rep. at 33, 1982 U.S.CODE CONG. & ADMIN.NEWS at 211.

### A. The Death of Bolden and The Re-Birth of the Results Test

■ Congress amended § 2 to remove the intent requirement established by the plurality decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and to restore the *pre-Bolden* "results test" established by the Supreme Court in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). S.Rep. at 27, 1982 U.S.CODE CONG. & ADMIN.NEWS at 205. In *Mobile v. Bolden,* the Supreme Court declared that a minority group could prove a § 2 violation only by showing that state officials intentionally maintained or adopted a contested electoral mechanism with a discriminatory purpose. 446 U.S. at 66–67, 100 S.Ct. at 1499–1500. The *Bolden* decision focuses the question in the wrong place. The intent of the legislature for the most part is irrelevant although it may be helpful in proving a § 2 claim. By amending § 2, Congress sought to direct the inquiry towards the effect a contested electoral mechanism has on a minority group's ability to participate equally in the political process and away from the legislature's intent.

The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system of practice in order to establish a violation. Plaintiffs must prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S.Rep. at 27, 1982 U.S.CODE CONG. & ADMIN.NEWS at 205.

Amended § 2 brought back to the forefront the results test established in *White v. Regester,* which provides that

tricts.

[t]he plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political process and to elect legislators of their choice.

*White*, 412 U.S. at 766, 93 S.Ct. at 2339, citing *Whitcomb v. Chavis*, 403 U.S. 124, 149–150, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971). The results test involves a searching and practical inquiry into the "past and present reality" of the circumstances existent in the challenged jurisdiction. *White*, 412 U.S. at 769–770, 93 S.Ct. at 2341. It is a flexible test which turns on the facts of each particular case.

To help guide the courts when applying the results test, Congress enumerated a number of typical factors plaintiffs could show to establish a § 2 claim. These factors are,

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. at 28–29, 1982 U.S.CODE CONG. & ADMN.NEWS at 206–207.

Congress did not intend these factors to be exhaustive as local circumstances may make other factors relevant. Moreover, plaintiffs are not required to prove any particular number of factors or that a majority of factors point a particular way to establish a violation. *Id.* at 29, 1982 U.S. CODE CONG. & ADMIN.NEWS at 207.

■ Although § 2 seeks to provide equal access to the political process, nothing in the Voting Rights Act or the case law gives members of a protected class an unqualified right to elect a number of representatives equal to its proportion of the population. Both *Whitcomb* and *White* provided that proof of a § 2 violation requires more than showing that the minority group has failed to elect representatives equal to its proportion of the population. S.Rep. at 23, 1982 U.S.CODE CONG. & ADMIN.NEWS at 200.

### III *Thornburg v. Gingles*

The Supreme Court considered the amendment to § 2 for the first time in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Thornburg*, black voters in North Carolina challenged a legislative redistricting plan for the State's Senate and House of Representatives. *Id.* at 33, 106 S.Ct. at 2758. The

Court's decision upholding the District Court's finding that the challenged redistricting plan violated § 2 streamlined both § 2 and the Senate Factors. The Court found that the Senate Report not only championed a flexible and fact-intensive approach to § 2 cases, but also limited the circumstances in which plaintiffs may prove a violation in three significant ways.

> First, electoral devices, such as at-large elections, may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Id.* at 46, 106 S.Ct. 2764.

The Court concluded that, despite the enumerated Senate Factors, three necessary preconditions must exist for a contested electoral mechanism to dilute minority voting power. First, the minority group must be sufficiently large and geographically compact enough to constitute a majority in a single member district.[5] *Id.* at 48, 106 S.Ct. at 2766. Second, the minority group must be politically cohesive. *Id.* at 51, 106 S.Ct. at 2767. Finally, the majority must vote sufficiently as a bloc to enable it usually to defeat a viable minority candidate. *Id.*

The Court determined that the most important Senate Factors in a vote dilution claim were (1) the extent to which minority group members have been elected to public office and (2) the extent to which voting in the political subdivision is racially polarized. *Id.* at 48 n. 15, 106 S.Ct. at 2766 n. 15. Although the Court considered the three preconditions the foundation necessary to any vote dilution claim, it was unclear whether proof of these preconditions dissolved the need to consider the remaining Senate Factors. Other courts considering *Thornburg* have held that the compactness, cohesiveness, and bloc voting inquiries are a gloss on the Senate Factors. Essentially, these courts have stated that *Thornburg* highlighted bloc voting and the extent to which minority groups have been successful at the polls, but that the remaining factors, though not essential to a vote dilution claim, may provide additional evidence of a § 2 violation. See, *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir.1987), *reh'g den.*, 849 F.2d 1471 (5th Cir.1988), *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547 (11th Cir.1987), *cert. den., sub nom. Duncan v. Carrollton*, — U.S. —, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988), *Collins v. City of Norfolk*, 816 F.2d 932 (4th Cir.1987), *Jackson v. Edgefield County, South Carolina School District*, 650 F.Supp. 1176 (D.S.C.1986).

### A. Racially Polarized Voting

The linchpin to any dilution claim is that voters in the majority group exhibit different voting patterns than members of the protected class. That is, each group prefers different candidates and polarizes their votes along racial lines. The theoretical underpinning to the claim is that absent either a bloc voting majority or the challenged electoral practice, the protected class would possess an ability equal to that

---

5. The Court expressly reserved the question of whether a minority group which could not constitute a majority in a single member district could still maintain a vote dilution claim. The Court stated,

> [w]e have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, which is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections. 478 U.S. at 46 n. 12, 106 S.Ct. at 2765 n. 12 (emphasis added).

The Northern District of Florida approved a plan in a § 2 case which did not give the plaintiffs a majority in a single member district. The defendants, however, had signed a consent judgment admitting to violating § 2. *Potter v. Washington County, Florida*, 653 F.Supp. 121 (N.D.Fla.1986). Therefore, that court did not address whether geographic compactness is an absolute precondition in a vote dilution claim.

of all other voters to influence the outcome of any given election. The inquiry into polarized voting, therefore, subsumes both the second and third *Thornburg* preconditions—political cohesiveness and majority bloc voting. "That [political cohesiveness] is not an inquiry to be made prior to and apart from a study of polarized voting ... because the central focus is upon voting patterns." *Campos v. City of Baytown,* 840 F.2d at 1244. The purpose of determining the existence of polarized voting, therefore, is twofold: to ascertain whether the minority group votes as a politically cohesive unit, thereby establishing minority bloc voting [6] and to determine whether the majority votes sufficiently as a bloc to defeat the minority candidate. *Thornburg,* 478 U.S. at 54, 106 S.Ct. at 2769. Without significant majority bloc voting, a minority group cannot claim that its ability to influence elections and to participate equally in the political process is inferior to that of the majority. *Id.* at 48 n. 15, 106 S.Ct. at 2766 n. 15.

### 1. Extraneous Elections

Both plaintiffs and defendants analyzed the Jefferson Parish councilmanic primary and general elections from 1975—1983. (See, Appendices A and B). A black ran in only 4 of those elections. The plaintiffs analyzed elections of thirteen additional elections which took place within the Parish. (See, Appendix C). The exogenous elections the plaintiffs analyzed are all within Jefferson Parish. Only one of those elections was Parishwide. The other elections represent small geographic areas and a small portion of the Parish population. As Plaintiffs' Exhibits # 8(B)(1)—8(B)(9) indicate, however, the aggregate representation from those elections is virtually parishwide.

■ Section 2 advocates a flexible, fact-intensive inquiry into the existent voting conditions in the contested district. The number and type of elections that a court must consider in a dilution claim varies according to the facts of each case. The elections most relevant in a § 2 claim are those from the district being challenged, since it gives the court a view of the voting patterns only from the challenged district. *Carrollton Branch,* 829 F.2d at 1558. If the elections from the challenged district do not provide sufficient evidence to determine if polarized voting exists, however, a court may consider other relevant factors. *Thornburg* counseled that evidence from only one or a few elections does not foreclose a vote dilution claim where the minority group has only recently begun to sponsor candidates. 478 U.S. at 57 n. 25, 106 S.Ct. at 2770 n. 25.

■ The flexible inquiry under § 2 allows the court to consider evidence of factors other than those enumerated in the Senate Report which may aid the court's consideration of polarized voting. In *Citizens for a Better Gretna,* the court refused to interpret *Thornburg* rigidly, but instead recognized that the flexible inquiry under § 2 allowed it to consider the 1984 Democratic Presidential Primary involving Jesse Jackson and the 1979 race for Louisiana Secretary of State involving a black candidate, Ben Jeffers, and not solely elections for Gretna aldermen. 834 F.2d at 502–503. Thus, if the councilmanic elections in Jefferson Parish provide insufficient evidence to allow the court to determine whether polarized voting exists, the court can consider other elections within the challenged district which may provide additional evidence of the voting patterns in Jefferson Parish.

As discussed below, the race of the candidate is relevant in this lawsuit. Since only four black candidates have sought positions on the Jefferson Parish council since 1975, this Court finds that consideration of only councilmanic elections would not provide sufficient evidence to determine whether polarized voting exists in Jef-

---

6. Plaintiffs elicited testimony from a number of black community leaders in Jefferson Parish that they often crossed district lines to help one another in political campaigns. This testimony may provide additional evidence of a minority group's political cohesiveness. However, the test most indicitative of political cohesiveness is whether the minority group votes as a bloc when it goes to the polls.

ferson Parish. The additional elections plaintiffs analyzed are among only Jefferson Parish voters and occurred within the recent past. Thus, this court finds that those elections are relevant and probative of the inquiry into polarized voting.

## 2. Race of the Candidate

Controversy exists over the extent to which this Court should consider the race of the candidate in determining whether racially polarized voting exists. Section 2 explicitly provides that one circumstance the court should consider is "the extent to which members of the protected class have been elected to office." Notwithstanding this apparently clear language, Justice Brennan emphatically stated in *Thornburg* that "both the language of § 2 and a functional understanding of the phenomenon of vote dilution mandate the conclusion that the *race of the candidate per se is irrelevant to racial bloc voting analysis." Id.* at 67, 106 S.Ct. at 2775 (emphasis added). Brennan concluded that the status of the candidate as the chosen representative of the minority group, not the race of the candidate is the proper inquiry under § 2. *Id.* at 68, 106 S.Ct. at 2776.

This portion of Brennan's opinion garnered only a plurality of the Court with Chief Justice Burger and Justices White, O'Connor, Powell, and Rehnquist dissenting from Brennan on the importance of the race of the candidate. Both Justices White and O'Connor stated that Brennan's view of the race of the candidate was inconsistent with the Court's decision in *Whitcomb.* Furthermore, Justice White reasoned that a minority group could prove a § 2 violation if black representatives were elected to office even if a majority of black voters did not support the winning candidate. *Id.* at 83, 106 S.Ct. at 2784 (White, J. concurring). This result, Justice White concluded, is nothing more than interest group politics rather than a "rule hedging against racial discrimination." *Id.*

In *Citizens for a Better Gretna v. Gretna,* the Fifth Circuit held that the race of the candidate is a relevant factor in a vote dilution claim. After reviewing the diverging opinions in *Thornburg,* the court wrote,

Mindful of these concerns, we conclude that *Gingles* is properly interpreted to hold that the race of the candidate is in general of less significance than the race of the voter,—but only within the context of an election that offers voters the choice of supporting a viable minority candidate ... Justice Brennan's plurality opinion is careful not to state that a black candidate is tantamount to the black preference; but implicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate. The various *Gingles* concurring and dissenting opinions do not consider evidence of elections in which only whites were candidates. Hence, neither do we.

*Id.* at 503–504. See, also *Smith v. Clinton,* 687 F.Supp. 1310 (E.D.Ark.1988) ("[W]e believe it is proper to give considerable weight to the evidence of polarization in elections between black and white candidates."), *McNeil v. City of Springfield,* 658 F.Supp. 1015, 1030 (C.D.Ill.1987).

A viable minority candidate is one which the minority group sponsors. *Campos v. City of Baytown,* 840 F.2d at 1245. If a minority candidate "gains little support from any segment of the community, it cannot be said that the minority community 'sponsored' the candidate and that election need not be considered." *Id.* at 1245 n. 7. Implicit in *Thornburg* is the notion that a minority group must provide active support to sponsor a candidate.

One important circumstance is the number of elections in which the minority group has sponsored candidates. Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process. Similarly, where a minority group has begun to sponsor candidates just recently, the fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim.

*Thornburg,* at 48 n. 15, 106 S.Ct. at 2770 n. 15. This implies that the minority group

must provide more than passive support through the ballot box. There is no threshold level of support a minority candidate needs to gain before it can be said that the minority community has sponsored that candidate. Whether a minority group has sponsored a candidate must be addressed on a case-by-case approach. The court must consider such relevant factors as the number of candidates in the election and the amount of support the minority candidate receives from different segments of the community. Consider an election in which four whites and one black run. If any one segment of the community provides a level of support which makes the minority candidate competitive with the other candidates who received support from that segment of the community, then that candidate could be considered a viable minority candidate. It is not likely, however, that a minority candidate would be considered viable if he does not receive serious consideration from any segment of the community.

 The Eleventh Circuit followed that portion of Justice Brennan's plurality opinion in *Thornburg* which stated that the race of the candidate is irrelevant in a vote dilution claim. *Carrollton Branch*, 829 F.2d at 1557. This Court is bound by the Fifth Circuit's lead in *Gretna* and *Campos* which hold that the race of the candidate is a factor deserving consideration in the court's determination of whether racially polarized voting exists in a particular jurisdiction.

The defendants argue, relying on *Thornburg*, that the court should not consider the race of the candidate, but should focus its inquiry on the race of the voter and the status of a candidate as the preferred candidate of the minority group. To support this argument, defendants assert that the candidate receiving the majority of votes from the minority group was the same as the candidate who received a majority of the votes from the majority group in the clear majority of councilmanic elections they analyzed. Yet, they also argue that plaintiffs have failed to prove that blacks in Jefferson Parish are politically cohesive because they did not provide consistent support to black candidates in councilmanic elections. (See, Defendants' Proposed Findings of Fact # 's 49, 61, and 68). The apparent double meaning of defendants' argument is that the race of the candidate is unimportant when considering bloc voting, but important in determining political cohesiveness.

The race of the candidate may not be important in every circumstance. However, if voting patterns in elections among only white candidates suggest that no racially polarized voting exists in the locality, but elections involving black candidates indicate that there is racially polarized voting, then the race of the candidate becomes relevant. The fact that blacks and whites prefer the same candidate in white only elections, but different candidates when blacks enter the race is strong evidence that racially polarized voting exists. A voting pattern of this type indicates that when the minority group sponsors a viable minority candidate, it meets strong opposition from a bloc voting majority. Racially polarized voting exists in a district if a bloc voting majority consistently defeats minority sponsored candidates, even if blacks and whites exhibit the same electoral preferences in white only elections. Section 2 was not designed, nor will it be construed, to provide minority groups the ability to participate equally in the electoral process and to have the opportunity to elect representatives *only* if those candidates are white. Therefore, a finding by this court that the voting patterns of the blacks and whites in Jefferson Parish differ when a viable minority candidate seeks office makes the race of the candidate a relevant factor in this case.

### 3. The Methods of Statistical Analysis Used

 The standard methods of statistical analysis in vote dilution claims is bivariate ecological regression analysis and extreme case analysis. See, *Thornburg*, at 53 n. 20, 106 S.Ct. at 2768 n. 20. These complimentary techniques yield estimates of the percentage of black and white voters who voted for each candidate in a particular election. Engstrom and McDonald, *Defini-*

*tions, Measurements, and Statistics: Weeding Wildgen's Thicket,* 20 Urban Lawyer 175, 177 (1988). Plaintiffs and defendants used these standard methods to analyze the election results in Jefferson Parish. Defendants accept as competent the analysis performed in the exogenous elections by plaintiffs' expert, Dr. Richard Engstrom. (See, Defendants' Proposed Finding of Fact # 53).

Defendants strenuously object to the use of the analysis performed by plaintiffs' expert Dr. Douglas Rose who analyzed the primary and general elections in Jefferson Parish from 1975–1983. Defendants contend that Dr. Rose's analysis is flawed since he utilized the "T" test, but evaluated his results with a "Z" distribution table. Defendants claim that the proper method is to use a "T" distribution table.

Kimball Brace and Dr. Rose analyzed twenty four of the same elections in Jefferson Parish.[7] In only seven of the races analyzed by Dr. Rose, the estimated percentage of vote by either blacks or whites varied by more than 2.0 percent from the percentage of vote estimated by Kimball Brace.[8] According to the figures of both Dr. Rose and Kimball Brace, black and white voters preferred the same candidate in five of those races. Of the other two races—the 1975 general election for the at-large seat in Districts 1 and 2 and the 1979 general election for the parishwide at-large seat, defendants acknowledge that the 1975 election was racially polarized. (Defendants' Proposed Finding of Fact # 63). In the 1979 general election for the at-large seat, blacks and whites had different first preferences. Both plaintiffs' and defendants' analyses of the 1979 election

reached this conclusion. In that election, Evans defeated Deviney with the support of a bloc voting minority. The white voters split their support between the two candidates with a narrow majority supporting Deviney.[9]

Notwithstanding the fact that a very real academic debate exists regarding the proper method of statistical analysis utilized by Kimball Brace and Dr. Rose, this court concludes that the variations in their results do not have a substantive bearing on the quest to determine if polarized voting, as that term has come to be defined under § 2, exists in Jefferson Parish.

### 4. An Analysis of Racially Polarized Voting in Jefferson Parish

■ The degree of racially polarized voting which is legally significant varies from district to district. The courts have not developed a litmus test for determining a level of legally significant polarized voting. However, the general indicia of polarized voting is the existence of a white bloc vote which consistently defeats the combined strength of a politically cohesive minority bloc vote and any white crossover. *Thornburg,* at 56, 106 S.Ct. at 2770. It is the usual predictability of the majority's success that distinguishes racially polarized voting from the minority group's occasional loss of an election. *Id.* at 51, 106 S.Ct. at 2767.

Since 1975, four black candidates have sought a seat on the Jefferson Parish council. None have advanced past the primary. In 1975, Eugene Fitchue sought the seat in District 2. Losing in the primary, Fitchue received only 6.5% of the total vote, 45.54% (47.46%)[10] of the black vote and 0.97%

7. Dr. Rose analyzed election returns from District 4, which has a black population of only 1%. The Court will not consider the returns from those elections in its analysis of this case since too few black voters reside in District 4 to yield reliable results from the statistical analysis.

8. The analyses provided by the plaintiffs and defendants for the remaining seventeen elections had a variance of less than 2.0 percent.

9. Defendants estimated that blacks cast 90.61% of their votes for Evans and 9.39% for Deviney. The white vote split with 48.57% supporting

Evans, and 51.43% supporting Deviney. (Appendix A). Plaintiffs estimated that Evans received 87.91% of the black vote and Deviney received 12.09%. White voters supported Deviney (51.46%) over Evans (48.53%). (Appendix B). Evans won the election gaining 51.5% of the total vote.

10. The first figure is the estimated percentage of vote yielded by weighted regression analysis. The figure in parenthesis represents the estimated percentage of vote in a homogeneous precinct or extreme case analysis.

(1.92%) of the white vote.[11] Had the election been held among only black voters, Fitchue would have advanced to the general election. None of Fitchue's four opponents received more than twenty five percent black support. Fitchue's forty five percent support in the black community indicates that he was the clear preference of the black voters. His inability to attract a significant number of white cross-over votes caused his defeat. Since Fitchue received clear support from the black community, but lost to a white bloc vote, this election could fairly be described as racially polarized.

In the 1979 primary election for the District 2 seat, Wallace, a black candidate, failed to gain sufficient support to advance to the general election. He received 5.9% of the total vote, 35.96% (40.23%) of the black vote, and 1.05% (1.93%) of the white vote. Wallace gained a plurality of support from the black community. However, he was not the clear first preference among black voters. The black vote was substantially split between Wallace and Lawson, who received 35.31% (33.60%) of black votes cast. However, Wallace, one of six candidates, would have advanced to the general election had the election been held among only black voters. The white vote was substantially split between Lawson (48.24%) and Winters (32.95%), both of whom advanced to the general election. It appears that Wallace did not reach the general election because of his inability to garner a sufficient number white crossover votes to defeat a white voting bloc despite gaining a plurality of support from the black community. This election tends to fit the criterion of one that is racially polarized.

In the 1983 primary elections, two blacks, Robert Hamilton and Leon Williams sought positions on the Jefferson Parish Council. Neither candidate advanced to the general election or received a plurality of support from black voters. Williams, a candidate for the at-large seat in Districts 3 and 4, received 28.47% (31.36%) of the black vote and 4.39% (4.50%) of the white vote. His opponent, Willie Hof received 73.21% (62.20%) of the black vote and 57.56% (56.73%) of the white vote. This election does not appear to be one properly described as racially polarized.

In Robert Hamilton's bid for the District 2 seat, he received 21.11% (27.08%) of the black vote and 3.83% (4.51%) of the white vote. The remainder of the black vote was split evenly between candidates Lawson and Nicholson. This election also does not appear to be racially polarized.

Plaintiffs' expert, Professor Richard Engstrom analyzed the 20 elections in which blacks have sought election in Jefferson Parish since 1980. (See, Appendix C).[12] In all but five elections, Engstrom concluded that voting in Jefferson Parish was racially polarized. In each of the elections that Professor Engstrom concluded was racially polarized, the black candidate received overwhelming support from black voters. Also, the correlation coefficient[13] for black voters preference indicates that black voters consistently supported the black candidate. The evidence reveals that despite strong support from the black community, a black candidate has rarely met with electoral success. Except for those

---

**11.** Although the court accepts the veracity of Dr. Rose's expert report and analysis, the court adopts the defendants figures for the purposes of analyzing the councilmanic elections. The court's conclusions would remain the same if it used the figures derived by Dr. Rose.

**12.** The charts provided in Professor Engstrom's expert report (Plaintiffs' Exhibit #20) have his analysis from only fifteen of those elections. Professor Engstrom listed only the elections he concluded were racially polarized. In five elections, Professor Engstrom concluded that there was no racially polarized voting. See, Plaintiffs' Exhibit #20 pp. 12–13.

**13.** The correlation coefficient is the measure of how consistently the scores for a dependent variable vary with the independent variable. The values for the correlation coefficient can range from a perfectly consistent positive relationship ($+1$) to a perfectly negative relationship ($-1$). The more consistent the tendency, the greater the value of the correlation coefficient. Engstrom and McDonald, *Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting,* 17 Urban Lawyer 369, 375 (1985).

elections noted below, Engstrom's analysis indicates that when a viable minority candidate seeks elective office in Jefferson Parish, a white voting bloc consistently defeats the combined strength of a minority voting bloc plus white crossover votes.

In the 1982 race for Kenner Council District 1, Wilma Irvin ran against two other black candidates, Anderson Council and Shirley Burton, and two white candidates, John Stoulig and Harry Polito. Irvin advanced to the general election with 39.5% (36.4%) of the black vote and 8.0% (7.9%) of the white vote. In the general election, Irvin defeated Stoulig. She received 51.5% of the total votes cast, 82.2% (88.0%) of the black vote, and 11.9% (15.9%) of the white vote. Irvin won, despite minimal white support, largely because 54.8% of the registered voters in Kenner District 1 were black at the time of the election.

Ellis Wilson successfully reached the general election for School Board District # 3 in 1983. In the primary election, Wilson received 84.2% (84.4%) of the black vote and 3.2% (5.2%) of the white vote. However, Wilson lost the general election despite receiving 93.5% (93.6%) of the black vote and 18.5% (20.8%) of the white vote.

Herbert Wallace successfully sought the position of Constable in the 7th Justice Court in 1987. The district in which Mr. Wallace ran had a 66.1% majority of black registered voters. Although the turnout for this election was low making precise estimates of voter behavior difficult, it is estimated both under weighted regression analysis and in a homogeneous precinct that Wallace received over 90% of the black total vote The estimates of white vote ranges from 0.0% in weighted regression analysis to 31.8% in the homogenous precinct of white voters. Nevertheless, these figures show that Mr. Wallace was not the preferred candidate of white voters but the clear preference of black voters.

Lloyd Lewis, Sr. unsuccessfully sought the seat for House District # 87 in 1983. In the primary election, Lewis obtained a clear majority of black support, receiving 60.8% (60.2%), but very little white support, receiving 0.0% (2.2%). Lewis reached the general election despite little white support because the white voters split their votes among the remaining five candidates all of whom were white. In the general election, Lewis received overwhelming black support 93.9% (94.5%) and minimal white crossover, 7.7% (5.9%), but received only 38.2% of the total vote.

Engstrom describes five elections in which the black candidate did not receive a majority of black support. (See, Plaintiffs' Exhibit # 20, pp. 12–13). The presence of elections which do not indicate racial polarization does not foreclose a § 2 claim, if there is an otherwise strong indication that racially polarized voting exists in a jurisdiction. *Thornburg,* at 56, 106 S.Ct. at 2770. Likewise, the success of minority candidates in one or a few elections does not necessarily prove that no polarized voting exists in the locality. *Id.* In each of the elections in which a black candidate reached the general election, the white vote was dispersed widely between a number of candidates. However, in the general election, the black candidate was consistently defeated behind a white bloc vote despite the existence of a strong bloc of minority votes. Likewise, the black candidates who have tasted election victory have all come from districts where the majority of registered voters were black.

From the elections submitted into evidence, it is difficult to conclude that the voting in Jefferson Parish is not racially polarized. In the councilmanic elections, white and black voters often preferred the same candidate in races involving only white candidates. However, when black candidates sought office in Jefferson Parish, a white bloc vote has consistently defeated what may be described as a more or less politically cohesive minority. The evidence also reveals that candidates favored by blacks can win council seats in Jefferson Parish, but only, so far, if those candidates are white.

## IV The Availability of a Remedy

As a result of the Voting Rights Act of 1965, Americans from all races, creeds, and national origins can now vote

and have that vote count as fully as the votes of their fellow Americans. S.Rep. at 4–5, 1982 U.S.CODE CONG. & ADMIN. NEWS at 181. Section 2, the enforcement mechanism of the Voting Rights Act, seeks to insure that all members of the electorate have an equal opportunity to participate in the political process and to elect representatives of their choice. If a contested electoral mechanism operates to dilute a minority group's voting power, the Voting Rights Act vests the court with the equity power to shape a remedy which will insure members of the protected class equal access to the political process.

Equal access, however, does not create a right to proportional representation. Neither the language of § 2 nor the case law provide members of a protected class an undiluted right to elect a particular representative. "Neither our written law nor the construct of our constitutional republic assures any race, or otherwise identifiable voting group, strict proportional representation." *Washington v. Tensas Parish School Board*, 819 F.2d 609, 612 (5th Cir. 1987), *reh'g den. en banc*, 826 F.2d 12 (5th Cir.1987) citing *Marshall v. Edwards*, 582 F.2d 927 (5th Cir.1978), *reh'g den.* 588 F.2d 828 (5th Cir.1978), *cert. den., sub nom. East Carroll Police Jury v. Marshall*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), and *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1161 (5th Cir. Unit A 1981).

#### A. The Ability to Influence Elections

*Thornburg* stated that a precondition to establishing a § 2 claim was that the minority group must be sufficiently large and compact to constitute a majority in a single member district.

> The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

*Id.* at 48 n. 15, 106 S.Ct. at 2766–2767 n. 15. However, the Court expressly refused to decide whether plaintiffs' inability to meet this precondition sounded a death knell to their claim.

> We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, which is not sufficiently large and compact to constitute a majority in a single member district, alleging that the use of a multimember district impairs its ability to *influence* elections.

*Thornburg* 480 U.S. at 46 n. 12, 106 S.Ct. at 2765–2766 n. 12. (emphasis provided). It is this apparent inconsistency in which this case lies and that this court must attempt to resolve.

In *Thornburg*, plaintiffs' ability to constitute a majority in a single member district, if indeed it is a requirement to establishing a § 2 claim, was not disputed, and therefore, the Court did not need to reach that question. See, *Id.* at 35 n. 1, 106 S.Ct. at 2787 n. 1 (O'Connor, J. concurring). If *Thornburg* is read to require plaintiffs to constitute a majority in a potential single member district to prove a § 2 claim, then the Court has established a test which does nothing more than insure a minority group will have some form of proportional representation.

> If a minority group is politically and geographically cohesive and large enough to constitute a majority in one or more single-member districts, then unless white voters usually support the minority's preferred candidates in sufficient numbers to enable the minority group to elect as many of those candidates as it could elect in such hypothetical districts, it will routinely follow that a vote dilution claim can be made out ...

> In my view, the Court's test for measuring minority voting strength and its test for vote dilution, operating in tandem, come closer to an absolute requirement of proportional representation than Congress intended when it codified the results test in § 2.

*Id.* at 93, 106 S.Ct. at 2789 (O'Connor, J. concurring).

Neither Congress nor the Court in *Thornburg* intended that minority group members obtain proportional representation by proving that their voting power is being diluted by a particular election mechanism. A fair reading of footnote 12 and the apparent requirement that plaintiffs be geographically compact enough to constitute a majority in a single member district is that plaintiffs may establish a § 2 violation and a right to relief *per se* if they prove the three preconditions set forth by Justice Brennan.

 If plaintiffs are unable to meet the compactness test, then the court may consider other relevant factors to determine whether plaintiffs can avail themselves to some relief. The Senate Report reaffirms a district court's equity power to fashion relief to remedy the effects of prior dilution. S.Rep. at 31, 1982 U.S.CODE CONG. & ADMIN.NEWS at 208. Under § 2, a court must determine whether a remedy is sufficient by determining whether it satisfies the results test. This test determines whether minority voters have an equal opportunity to participate in the political process and to elect representatives of its choice. This Court, therefore, concludes that plaintiffs may have the legal ability to seek and to obtain some relief if they prove that they are politically cohesive, that a majority voting bloc usually defeats its preferred candidates, and that they are geographically compact so that a proposed remedy will insure them *equal access* to the political process and provide them the ability to *influence* elections.

 The court possesses the equity power to fashion the relief to remedy the effects of the prior dilution and to give the minority group the opportunity to participate equally in the electoral process. *Id.* I conclude, however, that such relief does not mandate a safe district with a super majority of 60% or greater black population. *United States v. Mississippi,* 444 U.S. 1050, 1056, 100 S.Ct. 994, 997, 62 L.Ed. 2d 739 (1980) (Marshall, J. dissenting). But cf., *United Jewish Organization v. Carey,*

430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (affirming the Attorney General's conclusion that a 65% majority was needed to achieve a non-white majority of eligible voters), *Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984), *cert. den., sub nom. City Council of Chicago v. Ketchum,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985) (it was an abuse of discretion for the district court to fail to use a 65% super majority in fashioning a remedy because it failed to give the minority group a realistic opportunity to elect a representative of its choice), *Rybicki v. State Board of Elections of the State of Illinois,* 574 F.Supp. 1082 (N.D.Ill.1982) (a 65% black majority is needed to provide a safe district).

Nor does that relief require a single member district with a majority of black voters. In *Potter v. Washington County, Fla.,* 653 F.Supp. 121 (N.D.Fla.1986), the district court accepted a plan to remedy a § 2 violation that did not give the plaintiffs a majority in any district. In *Potter,* the defendants signed a consent decree admitting that the at-large system of electing county officials violated the Voting Rights Act. The court concluded that providing the plaintiffs a district with a majority of blacks, who constituted only 13.1% of the voting age population, amounted to giving the plaintiffs a right to proportional representation. "Absent controlling authority requiring me to fashion such an affirmative remedy, I decline to do so." *Id.* at 128.

Jefferson Parish has a similar situation to that of *Potter.* The black population is dispersed throughout the Parish, and the blacks constitute a small percentage of the voting age population (11.78%). Plaintiffs, I believe, are entitled to a remedy which provide them with *equal* voting power, but a finding that there is racially polarized voting does not entitle plaintiffs to a voice on the Jefferson Parish Council, only a realistic voice in the councilmanic elections.

B. *The Compactness Inquiry*

Jefferson Parish is second only to Orleans Parish as the most densely populated parish in Louisiana. The 13.9% black population is dispersed widely throughout the

Parish. (See, Defendants' Exhibit # 25). Majority black precincts are located in Westwego, in Kenner along the Mississippi River just below the airport, above the airport along Interstate 10 and throughout the Gretna area.

Plaintiffs have proposed a reapportionment plan which divides Jefferson Parish into seven single-member districts. (Plaintiffs' Exhibit # 8A). One district (District # 3) would have a 56% black voting age population and 56.5% of black registered voters. (Plaintiffs' Exhibit # 9). Plaintiffs' expert, Ronald Weber, the architect of this plan, candidly acknowledged that he drew his plan with the intention of creating a district with a majority population of black voters. To do so, he engaged in a mission to search and to include black voters in his district wherever possible. The district contains no less than 35 sides and crosses the Mississippi River which acts as a major natural boundary.[14] Professor Weber also divided the City of Kenner to accomplish the affirmative purpose of advancing minority voter interests. *Id.*

A remedy must strive to insure that the minority group has an equal opportunity to influence the political process. The remedy must also comply with § 2 requirements, *Dillard v. Crenshaw County, Ala.*, 831 F.2d 246, 249 (11th Cir.1987), and observe the traditional notions of reapportionment.

> The overriding objectives must be substantial equality of population among the various districts, without the dilution of the strength of minority voting groups. Geographical and administrative considerations are not reprobated so long as they are not used to justify disparity from equal and not invidiously biased representation.

*Wyche,* 635 F.2d at 1162 (citations omitted). The district judge must steer a middle course, following the guidance afforded by *Marshall v. Edwards.* He must be mindful of the impact of a proposed plan on different racial groups. He must analyze the plan and determine that it does not dilute minority voting strength but he must avoid a strict proportionality brought about by the manipulation of district lines. He should fix boundaries that are compact contiguous and that preserve natural, political and traditional representation.

*Id.* at 1163.

 A proposed district is sufficiently compact if it retains a natural sense of community. To retain that sense of community, a district should not be so convoluted that its representative could not easily tell who actually lives within the district. See, *Dillard v. Baldwin County,* 686 F.Supp. 1459 (N.D.Ala.1988). The plaintiffs' plan stretches along the river and reaches around the airport to include a concentration of black residents living above the airport. This court cannot accept a plan which contains a district which is drawn with the acknowledged intent to include minorities, but which does not meet the minimal requirements of reapportionment. The plaintiffs' proposed plan is neither sufficiently realistic, nor is it an acceptable remedy to the vote dilution which appears to exist under the current plan.

On the other hand, the present plan for the Jefferson Parish councilmanic districts tends to effect an impermissible long range dilution of plaintiffs voting power. Though defendants argue that their triple tiered scheme provides each voter "with three representatives"—one from the single-member district, one from the East or West Bank and one from the parish at-large—instead of just one, this contention is of dubious merit. Far more compelling, from the standpoint of this litigation, is the fact that the essence of the § 2 shortcomings in the current plan derives from the very few and very large single-member districts created by this scheme.

---

14. District # 1 of the contested reapportionment plan also crosses the Mississippi River. Much testimony was offered at trial that the East Bank and West Bank of Jefferson Parish are two vastly different communities. Yet, both plaintiffs and defendants in the plans before the court have chosen to place some residents from both the East and West bank in the same district. Defendants did so to have equal population distributions between the districts. Plaintiffs did so to maximize the number of black voters in Proposed District # 3.

This court is obliged to disagree with the observations of the councilmen who testified that the current plan gives each voter "three representatives instead of just one." This Court must also measure the effect of this unique rationalization against the inquiry of whether this unique system has a serious effect on the voting rights of the minority. When such heightened judicial scrutiny is applied, the observation is inescapable that the essential impact of the current plan tends to reduce the number of district representatives and almost double the size of the each single-member district (assuming the continuation of a seven member council).[15]

Black voters in Jefferson Parish are entitled to an effective voice in the electoral process and to an influence in the outcome of elections. They have the highest and most realistic opportunity of achieving such a voice and influence through district-wide (as opposed to East–Bank, West–Bank and parishwide) elections. A continuation of the current three tiered arrangement wherein three of the seven councilmembers are elected from political configurations larger than the existing, overly large single-member districts bodes little hope for the minority voters of Jefferson Parish achieving electoral equality.

Plaintiffs proposed remedy is a totally unacceptable gerrymander and an impermissible short cut to force proportional representation on the Council. There is a need, however, to provide minority voters *equal access* to the political process that will provide a realistic ability to *influence* elections.

Clearly, one alternative to this dilemma would be a greater number of single-member districts with a voting age population per district small enough to allow black voters to assert a real influence. Although Jefferson Parish may have a genuine interest in maintaining some form of at-large or floaterial districts that provide separate representation to the East and West Banks, and may also have a real interest in keeping the size of the Council at a manageable level, a plan with only four single-member districts is highly questionable. Such overly large districts tend to cause and to perpetuate the vote dilution which currently appears to exist in Jefferson Parish. Although it is the common responsibility of the parties to articulate the specifics of a solution, plans which may provide a suitable remedy and also recognize the Parish's interests are perhaps seven or nine single-member districts with two floaterial districts—one from each bank of the River. The § 2 shortcomings of the present plan cause this Court much concern, and this Court finds that it is in the best interest of all those affected by this litigation to require that plaintiffs and defendants provide alternative plans which may more fully insure that the minority voters in Jefferson Parish achieve equal access to the political process. Thus, plaintiffs and defendants are accordingly required to submit alternative plans to this Court within sixty days of entry of this decision.

**15.** The average population in the current district is 113,668 persons whereas, the ideal population in the plaintiffs' plan is 64,942 persons.

# APPENDIX A
## ELECTIONS ANALYZED BY KIMBALL BRACE

Racial Bloc Voting Analysis
(weighted estimates)

### 1975 Primary Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Council At-Large (All districts) | | | | | | | | | | | | | |
| Donelon | 71.5 | 50.65 | 74.78 | −.23 | 15.30 | 67.71 | 71.30 | .23 | 15.30 | 51.17 | 78.69 | 69.56 | 73.19 |
| Sahuc | 4.2 | 2.26 | 3.34 | −.22 | 1.70 | 4.04 | 4.25 | .22 | 1.70 | 2.88 | 4.43 | 4.13 | 4.35 |
| Valence | 24.3 | 14.82 | 21.88 | −.11 | 15.80 | 23.22 | 24.45 | .11 | 15.80 | 10.98 | 16.88 | 21.35 | 22.46 |
| % Votes Cast | | 67.73 | | | | 94.97 | | | | 65.03 | | 95.05 | |
| Council At-Large (Districts 1 & 2) | | | | | | | | | | | | | |
| Ehret | 16.4 | 8.01 | 10.90 | −.25 | 8.05 | 15.72 | 17.07 | .25 | 8.05 | 8.32 | 11.38 | 14.52 | 15.82 |
| Giardina | 31.7 | 11.20 | 15.25 | −.40 | 12.25 | 31.16 | 33.84 | .40 | 12.24 | 11.04 | 15.10 | 31.05 | 33.82 |
| Molaison | 39.2 | 38.55 | 52.48 | .10 | 10.95 | 34.50 | 37.47 | −.10 | 10.95 | 37.03 | 50.64 | 35.42 | 38.58 |
| Ribando | 12.7 | 15.71 | 21.39 | .25 | 5.16 | 10.70 | 11.62 | −.25 | 5.16 | 16.73 | 22.88 | 10.81 | 11.78 |
| % Votes Cast | | 73.46 | | | | 92.08 | | | | 73.13 | | 91.79 | |
| Parish Council (Districts 3 & 4) | | | | | | | | | | | | | |
| Bertolano | 15.6 | 29.18 | 40.58 | .20 | 11.41 | 14.24 | 14.80 | −.20 | 11.41 | N/A | N/A | 14.03 | 14.58 |
| Heaslip | 49.8 | 50.26 | 69.89 | .07 | 6.78 | 47.28 | 49.14 | −.08 | 6.78 | N/A | N/A | 47.40 | 49.27 |
| Treen | 34.6 | 0.00 | 0.00 | −.56 | 9.43 | 34.71 | 36.07 | .56 | 9.44 | N/A | N/A | 34.77 | 36.14 |
| % Votes Cast | | 71.91 | | | | 96.22 | | | | N/A | | 96.20 | |
| Parish Council (District 1) | | | | | | | | | | | | | |
| Miller | 76.5 | 65.26 | 89.95 | −.10 | 9.52 | 69.29 | 74.90 | .10 | 9.52 | 59.32 | 82.42 | 69.10 | 74.20 |
| Trafficano | 23.5 | 7.37 | 10.15 | −.48 | 6.81 | 23.21 | 25.09 | .48 | 6.81 | 12.66 | 17.58 | 24.03 | 25.80 |
| % Votes Cast | | 72.63 | | | | 92.51 | | | | 71.98 | | 93.13 | |
| Parish Council (District 2) | | | | | | | | | | | | | |
| Dufrene | 38.0 | 17.85 | 22.63 | .50 | 9.40 | 36.88 | 40.24 | .50 | 9.41 | 18.56 | 23.68 | 37.01 | 40.74 |
| Eymard | 16.0 | 5.07 | 6.43 | −.28 | 10.53 | 15.91 | 17.36 | .28 | 10.53 | 4.46 | 5.68 | 14.29 | 15.73 |
| Fitchue | 6.5 | 35.92 | 45.54 | .88 | 5.39 | .89 | .97 | −.88 | 5.39 | 37.20 | 47.46 | 1.75 | 1.92 |
| Lawson | 34.1 | 19.13 | 24.25 | −.41 | 8.53 | 32.52 | 35.49 | .41 | 8.52 | 17.26 | 22.02 | 32.53 | 35.81 |
| Nobles | 5.3 | .92 | 1.17 | −.50 | 2.25 | 5.45 | 5.95 | .50 | 2.25 | .91 | 1.16 | 5.26 | 5.79 |
| % Votes Cast | | 78.88 | | | | 91.64 | | | | 78.37 | | 90.83 | |
| Parish Council (District 3) | | | | | | | | | | | | | |
| Ackel | 75.5 | 62.34 | 90.41 | −.31 | 5.06 | 69.73 | 74.30 | .31 | 5.06 | N/A | N/A | 69.96 | 74.57 |
| Maynard | 24.5 | 6.61 | 9.59 | −.64 | 4.69 | 24.12 | 25.70 | .64 | 4.68 | N/A | N/A | 23.85 | 25.43 |
| % Votes Cast | | 68.95 | | | | 93.85 | | | | N/A | | 93.82 | |

Racial Bloc Voting Analysis
(weighted estimates)

### 1975 General Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Regis | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Regis | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Regis | Votes Cast | WHITE Regis | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Council At-Large (Districts 1 & 2) | | | | | | | | | | | | | |
| Giardina | 58.4 | 7.26 | 35.92 | −.59 | 6.34 | 24.17 | 60.47 | .59 | 6.34 | 8.17 | 40.03 | 24.55 | 60.63 |
| Molaison | 41.6 | 12.96 | 64.13 | −.19 | 4.10 | 15.79 | 39.50 | .19 | 4.10 | 12.24 | 59.97 | 15.94 | 39.37 |
| % Votes Cast | | 20.21 | | | | 39.97 | | | | 20.41 | | 40.49 | |
| Council At-Large (Districts 3 & 4) | | | | | | | | | | | | | |
| Heaslip | 59.0 | 22.73 | 100.-00 | .02 | 5.81 | 22.03 | 57.41 | −.02 | 5.81 | 8.68 | 41.43 | 21.93 | 57.28 |
| Treen | 41.0 | 0.00 | 0.00 | −.44 | 5.31 | 16.34 | 42.59 | .44 | 5.31 | 12.28 | 58.57 | 16.36 | 42.72 |
| % Votes Cast | | 20.00 | | | | 38.37 | | | | 20.96 | | 38.29 | |
| Parish Council (District 2) | | | | | | | | | | | | | |
| Dufrene | 42.5 | 9.69 | 42.37 | −.52 | 4.00 | 17.69 | 42.52 | .52 | 4.00 | N/A | N/A | 17.51 | 42.11 |
| Lawson | 57.5 | 13.18 | 57.63 | −.53 | 5.21 | 23.91 | 57.48 | .53 | 5.21 | N/A | N/A | 24.07 | 57.89 |
| % Votes Cast | | 22.87 | | | | 41.60 | | | | N/A | · | 41.59 | |

## Racial Bloc Voting Analysis
### (weighted estimates)
### 1979 Primary Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Council At-Large (All Districts)** | | | | | | | | | | | | | |
| Chehardy | 10.5 | 11.28 | 15.86 | .11 | 3.29 | 9.62 | 10.11 | −.11 | 3.29 | 10.99 | 15.25 | 9.57 | 10.08 |
| Deviney | 31.2 | 1.20 | 1.69 | −.50 | 11.56 | 31.69 | 33.31 | .50 | 11.56 | 8.13 | 11.27 | 33.22 | 34.96 |
| Evans | 35.1 | 24.55 | 34.53 | −.26 | 6.98 | 33.40 | 35.10 | .27 | 6.98 | 23.63 | 32.78 | 32.91 | 34.64 |
| Nicholson | 18.0 | 27.25 | 38.33 | .29 | 8.36 | 15.79 | 16.59 | −.29 | 8.36 | 25.04 | 34.74 | 14.89 | 15.67 |
| Schouest | 5.2 | 6.82 | 9.59 | .15 | 3.06 | 4.66 | 4.90 | −.15 | 3.06 | 4.29 | 5.96 | 4.42 | 4.65 |
| % Votes Cast | | 71.10 | | | | 95.15 | | | | 72.08 | | 95.02 | |
| **Council At-Large (Districts 1 & 2)** | | | | | | | | | | | | | |
| Berry | 4.4 | 3.09 | 4.65 | −.15 | 1.58 | 4.01 | 4.40 | .15 | 1.58 | 3.10 | 4.70 | 4.10 | 4.53 |
| Breaux | 11.7 | 8.80 | 13.23 | −.16 | 2.78 | 10.52 | 11.54 | .16 | 2.78 | 8.43 | 12.78 | 10.39 | 11.47 |
| Caramonta | 13.6 | 8.39 | 12.61 | −.15 | 7.24 | 12.47 | 13.68 | .15 | 7.24 | 7.74 | 11.73 | 11.53 | 12.73 |
| Giardina | 61.9 | 39.89 | 59.97 | −.51 | 7.59 | 56.68 | 62.16 | .51 | 7.59 | 39.52 | 59.93 | 56.66 | 62.55 |
| Schouest | 8.4 | 6.35 | 9.54 | −.11 | 2.65 | 7.50 | 8.2 | .11 | 2.65 | 7.16 | 10.86 | 7.89 | 8.72 |
| % Votes Cast | | 66.52 | | | | 91.18 | | | | 65.95 | | 90.58 | |
| **Council At-Large (Districts 3 & 4)** | | | | | | | | | | | | | |
| Burke | 12.5 | 13.37 | 19.94 | .08 | 3.96 | 11.42 | 12.30 | −.08 | 3.96 | 14.19 | 21.00 | 11.42 | 12.32 |
| Cole | 5.4 | 1.58 | 2.36 | −.25 | 2.20 | 5.07 | 5.46 | .25 | 2.20 | 2.54 | 3.76 | 5.11 | 5.52 |
| Fasola | 4.2 | 1.59 | 2.37 | −.19 | 2.05 | 3.96 | 4.26 | .19 | 2.05 | 2.54 | 3.76 | 3.98 | 4.30 |
| Hof | 25.3 | 37.78 | 56.34 | .21 | 11.56 | 22.57 | 24.31 | −.21 | 11.56 | 25.51 | 37.74 | 21.85 | 23.57 |
| Hubbell | 6.6 | .57 | .85 | −.21 | 4.47 | 6.28 | 6.76 | .21 | 4.47 | 2.30 | 3.40 | 6.38 | 6.89 |
| Romano | 26.6 | 14.98 | 22.34 | −.32 | 4.73 | 24.84 | 26.75 | .32 | 4.73 | 17.88 | 26.46 | 24.82 | 26.77 |
| White | 19.4 | 0.00 | 0.00 | −.35 | 9.50 | 18.72 | 20.16 | .35 | 9.50 | 2.63 | 3.88 | 19.13 | 20.64 |
| % Votes Cast | | 67.06 | | | | 92.85 | | | | 67.60 | | 92.70 | |
| **Parish Council (District 1)** | | | | | | | | | | | | | |
| Alison | 6.7 | .12 | .20 | −.34 | 3.98 | 6.72 | 7.28 | .34 | 3.98 | 1.53 | 2.30 | 7.16 | 7.74 |
| Cambre | 5.4 | 3.90 | 6.38 | −.14 | 1.49 | 4.86 | 5.26 | .14 | 1.49 | 2.04 | 3.07 | 4.65 | 5.03 |
| Ford | 4.4 | .97 | 1.59 | −.22 | 3.18 | 4.28 | 4.63 | .22 | 3.18 | 1.78 | 2.69 | 4.32 | 4.67 |
| Romero | 17.0 | 5.87 | 9.60 | −.40 | 5.15 | 16.39 | 17.74 | .41 | 5.15 | 4.08 | 6.13 | 15.49 | 16.74 |
| Sacco | 12.5 | .78 | 1.28 | −.42 | 5.54 | 12.58 | 13.62 | .42 | 5.54 | 1.66 | 2.49 | 12.68 | 13.71 |
| Trafficano | 6.7 | 3.64 | 5.95 | −.14 | 3.97 | 6.24 | 6.76 | .14 | 3.97 | 3.57 | 5.36 | 6.25 | 6.76 |
| Ward | 47.4 | 45.87 | 75.02 | .15 | 6.67 | 41.29 | 44.70 | −.15 | 6.67 | 51.85 | 77.97 | 41.94 | 45.35 |
| % Votes Cast | | 61.14 | | | | 92.37 | | | | 66.50 | | 92.49 | |
| **Parish Council (District 2)** | | | | | | | | | | | | | |
| Fayard | 5.2 | 1.62 | 2.14 | −.29 | 3.53 | 5.17 | 5.65 | .29 | 3.53 | 1.54 | 2.05 | 5.07 | 5.57 |
| Lawson | 46.5 | 26.73 | 35.31 | −.61 | 6.80 | 44.17 | 48.24 | .61 | 6.80 | 25.15 | 33.60 | 44.49 | 48.84 |
| Monfra | 4.9 | 2.98 | 3.94 | −.13 | 3.71 | 4.59 | 5.01 | .13 | 3.71 | 1.30 | 1.74 | 3.69 | 4.05 |
| Nobles | 7.4 | 7.23 | 9.55 | .09 | 2.49 | 6.50 | 7.10 | −.09 | 2.49 | 4.08 | 8.95 | 6.31 | 6.93 |
| Wallace | 5.9 | 27.22 | 35.96 | .83 | 5.23 | .96 | 1.05 | −.83 | 5.23 | 30.11 | 40.23 | 1.75 | 1.93 |
| Winters | 30.2 | 9.92 | 13.10 | −.64 | 7.25 | 30.17 | 32.95 | .64 | 7.25 | 10.05 | 13.43 | 29.77 | 32.68 |
| % Votes Cast | | 75.70 | | | | 91.57 | | | | 74.85 | | 91.10 | |
| **Parish Council (District 3)** | | | | | | | | | | | | | |
| Broussard | 79.4 | 59.76 | 91.52 | −.56 | 4.64 | 72.99 | 78.53 | .56 | 4.65 | 63.99 | 92.09 | 72.81 | 78.41 |
| Blanc | 20.6 | 5.53 | 8.47 | −.62 | 4.28 | 19.95 | 21.47 | .62 | 4.28 | 5.50 | 7.91 | 20.05 | 21.59 |
| % Votes Cast | | 65.30 | | | | 92.94 | | | | 69.48 | | 92.85 | |

## Racial Bloc Voting Analysis
### (weighted estimates)
### 1979 General Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Council At-Large (All Districts)** | | | | | | | | | | | | | |
| Deviney | 48.5 | 7.27 | 9.39 | −.65 | 10.72 | 49.72 | 51.43 | .65 | 10.72 | 13.62 | 17.15 | 50.96 | 52.73 |
| Evans | 51.5 | 70.12 | 90.61 | .43 | 10.48 | 46.95 | 48.57 | −.43 | 10.48 | 65.82 | 82.85 | 45.67 | 47.27 |
| % Votes Cast | | 77.39 | | | | 96.67 | | | | 79.44 | | 96.65 | |
| **Council At-Large (Districts 3 & 4)** | | | | | | | | | | | | | |
| Hof | 60.9 | 46.82 | 61.73 | −.31 | 5.60 | 58.18 | 60.86 | .31 | 5.60 | 43.98 | 56.08 | 57.98 | 60.73 |
| Romano | 39.1 | 29.04 | 38.29 | −.26 | 5.17 | 37.40 | 39.13 | .26 | 5.17 | 34.45 | 43.92 | 37.50 | 39.27 |
| % Votes Cast | | 75.85 | | | | 95.59 | | | | 78.44 | | 95.48 | |

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Parish Council (District 2)** | | | | | | | | | | | | | |
| Lawson | 60.5 | 47.49 | 57.59 | −.43 | 6.52 | 57.86 | 61.04 | .43 | 6.52 | 45.93 | 56.06 | 57.98 | 61.84 |
| Winters | 39.5 | 34.96 | 42.40 | −.09 | 6.82 | 36.93 | 38.96 | .09 | 6.82 | 36.01 | 43.94 | 36.54 | 38.66 |
| % Votes Cast | | 82.46 | | | | 94.79 | | | | 81.94 | | 94.52 | |

Racial Bloc Voting Analysis
(weighted estimates)

1983 General Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Council At-Large (District 2)** | | | | | | | | | | | | | |
| Lawson | 51.8 | 47.26 | 50.57 | −.12 | 9.33 | 50.80 | 52.12 | .12 | 9.33 | 49.62 | 53.13 | 53.02 | 54.46 |
| Nicholson | 48.2 | 46.20 | 49.44 | −.02 | 8.89 | 46.65 | 47.87 | .02 | 8.89 | 43.76 | 46.87 | 44.33 | 45.54 |
| % Votes Cast | | 93.45 | | | | 97.46 | | | | 93.38 | | 97.35 | |

Racial Bloc Voting Analysis
(unweighted estimates)

1983 General Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Council At-Large (District 2)** | | | | | | | | | | | | | |
| Lawson | 51.8 | 47.00 | 50.42 | −.16 | 8.63 | 52.22 | 53.55 | .16 | 8.63 | 49.62 | 53.13 | 53.02 | 54.46 |
| Nicholson | 48.2 | 46.21 | 49.57 | .03 | 8.41 | 45.30 | 46.45 | −.03 | 8.40 | 43.76 | 46.87 | 44.33 | 45.54 |
| % Votes Cast | | 93.22 | | | | 97.52 | | | | 93.38 | | 97.35 | |

Racial Bloc Voting Analysis
(weighted estimates)

1983 Primary Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | WHITE estimate of percent Turn-out | Votes Cast | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK Turn-out | Votes Cast | WHITE Turn-out | Votes Cast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Council At-Large (Districts 1 & 2)** | | | | | | | | | | | | | |
| Giardina | 82.1 | 48.62 | 85.78 | −.75 | 5.22 | 69.61 | 81.62 | .74 | 5.23 | 48.48 | 88.17 | 68.33 | 82.22 |
| Mitchell | 17.9 | 8.05 | 14.20 | −.58 | 3.02 | 15.68 | 18.38 | .57 | 3.02 | 6.50 | 11.83 | 14.78 | 17.78 |
| % Votes Cast | | 56.68 | | | | 85.29 | | | | 54.99 | | 83.13 | |
| **Council At-Large (Districts 3 & 4)** | | | | | | | | | | | | | |
| Hild | 36.6 | 0.00 | 0.00 | −.62 | 7.12 | 32.33 | 38.06 | .62 | 7.13 | 4.48 | 6.44 | 32.78 | 38.77 |
| Hof | 58.1 | 49.79 | 73.21 | .02 | 8.39 | 48.89 | 57.56 | −.02 | 8.39 | 43.21 | 62.20 | 47.96 | 56.73 |
| Williams | 5.3 | 19.36 | 28.47 | .85 | 1.67 | 3.73 | 4.39 | −.85 | 1.67 | 21.79 | 31.36 | 3.80 | 4.50 |
| % Votes Cast | | 68.01 | | | | 84.94 | | | | 69.48 | | 84.54 | |
| **Parish Council (District 1)** | | | | | | | | | | | | | |
| Chaisson | 10.9 | 4.32 | 8.15 | −.43 | 2.51 | 9.91 | 11.23 | .43 | 2.50 | 4.71 | 8.18 | 9.86 | 11.30 |
| Fadaol | 19.9 | 3.34 | 6.30 | −.46 | 6.31 | 18.70 | 21.19 | .46 | 6.33 | 6.64 | 11.52 | 18.69 | 21.44 |
| Ward | 69.2 | 45.35 | 85.55 | −.35 | 8.11 | 59.64 | 67.59 | .35 | 8.11 | 46.25 | 80.30 | 58.64 | 67.25 |
| % Votes Cast | | 53.01 | | | | 88.24 | | | | 57.60 | | 87.19 | |
| **Parish Council (District 2)** | | | | | | | | | | | | | |
| Alario | 8.5 | 3.61 | 4.34 | −.34 | 4.22 | 8.27 | 9.31 | .34 | 4.22 | 3.04 | 4.14 | 7.59 | 8.76 |
| Hamilton | 8.1 | 21.11 | 27.75 | .87 | 3.21 | 3.40 | 3.83 | −.87 | 3.21 | 19.87 | 27.08 | 3.91 | 4.51 |
| Lawson | 41.0 | 26.39 | 34.69 | −.50 | 6.33 | 37.80 | 42.55 | .50 | 6.33 | 27.15 | 36.99 | 38.17 | 44.00 |
| Nicholson | 42.4 | 24.97 | 32.82 | −.57 | 6.63 | 39.35 | 44.30 | .57 | 6.63 | 23.33 | 31.79 | 37.07 | 42.74 |
| % Votes Cast | | 76.08 | | | | 88.83 | | | | 73.39 | | 86.74 | |
| **Parish Council (District 3)** | | | | | | | | | | | | | |
| Gillen | 48.8 | 35.77 | 53.02 | −.02 | 7.62 | 36.39 | 47.94 | .02 | 7.62 | 46.00 | 68.38 | 37.98 | 49.91 |
| Hooper | 51.2 | 31.70 | 46.98 | −.24 | 7.43 | 39.51 | 52.06 | .24 | 7.43 | 21.28 | 31.62 | 38.11 | 50.09 |
| % Votes Cast | | 67.47 | | | | 75.90 | | | | 67.28 | | 76.09 | |

Racial Bloc Voting Analysis
(weighted estimates)

1987 Primary Election

| ELECTION RACE | % OF TOTAL | BLACK estimate of percent | | corr coef (r) | std error est | WHITE estimate of percent | | corr coef (r) | std error est | HOMOGENEOUS ANALYSIS BLACK | | WHITE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Turn-out | Votes Cast | | | Turn-out | Votes Cast | | | Turn-out | Votes Cast | Turn-out | Votes Cast |
| **Council At-Large (Districts 1 & 2)** | | | | | | | | | | | | | |
| Ellish | 19.1 | 6.17 | 8.74 | −.55 | 4.93 | 18.18 | 20.80 | .54 | 4.95 | 7.10 | 10.86 | 17.40 | 20.34 |
| Giardina | 67.7 | 53.44 | 75.70 | −.28 | 4.19 | 57.94 | 66.29 | .28 | 4.19 | 51.98 | 79.50 | 57.90 | 67.65 |
| Sacco | 7.7 | 5.18 | 7.34 | −.23 | 1.87 | 6.84 | 7.83 | .23 | 1.87 | 4.55 | 6.96 | 6.35 | 7.42 |
| Sapia | 5.5 | 5.80 | 8.22 | .08 | 4.79 | 4.44 | 5.08 | −.08 | 4.79 | 1.74 | 2.66 | 3.93 | 4.59 |
| % Votes Cast | | 70.59 | | | | 87.41 | | | | 65.38 | | 85.58 | |
| **Council At-Large (Districts 3 & 4)** | | | | | | | | | | | | | |
| Burke | 33.4 | 27.12 | 42.92 | .01 | 6.11 | 26.93 | 31.87 | .00 | 6.11 | 27.58 | 43.38 | 27.02 | 31.79 |
| Muniz | 66.6 | 36.07 | 57.08 | −.34 | 10.03 | 57.57 | 68.14 | .34 | 10.02 | 36.01 | 56.62 | 57.96 | 68.21 |
| % Votes Cast | | 63.19 | | | | 84.49 | | | | 63.59 | | 84.98 | |
| **Parish Council (District 1)** | | | | | | | | | | | | | |
| Falgoust | 27.4 | 11.01 | 17.51 | −.60 | 3.91 | 25.61 | 28.69 | .59 | 3.95 | 11.76 | 19.46 | 24.51 | 28.16 |
| Ward | 72.6 | 51.86 | 82.49 | −.49 | 4.23 | 63.64 | 71.31 | .49 | 4.25 | 48.69 | 80.54 | 62.52 | 71.84 |
| % Votes Cast | | 62.87 | | | | 89.25 | | | | 60.45 | | 87.03 | |
| **Parish Council (District 3)** | | | | | | | | | | | | | |
| Hooper | 61.7 | 54.83 | 85.03 | .06 | 7.85 | 52.96 | 59.97 | −.06 | 7.85 | 49.25 | 79.05 | 50.94 | 58.14 |
| Morrow | 27.5 | 10.39 | 16.11 | −.53 | 5.58 | 25.03 | 28.34 | .53 | 5.59 | 11.41 | 18.31 | 25.52 | 29.12 |
| Mosca | 10.8 | 0.00 | 0.00 | −.44 | 5.42 | 10.33 | 11.70 | .44 | 5.41 | 1.63 | 2.62 | 11.16 | 12.73 |
| % Votes Cast | | 64.48 | | | | 88.31 | | | | 62.30 | | 87.62 | |

# APPENDIX B

# ELECTIONS ANALYZED BY DR. ROSE

## REGRESSION ESTIMATES OF VOTING BY RACE IN THE JEFFERSON PARISH COUNCIL ELECTIONS

### 1975 PRIMARY

SOURCE: Kimball Brace, Defendants' expert witness' scattergrams weighted regression analysis Council Chairman—at large entire parish

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| Donelon | 71.19 | 75.78 |
| Sahuc | 4.23 | 3.67 |
| Valence | 24.58 | 20.55 |
| Total | 100.00 | 100.00 |
| **District 1 and 2, At large** | | |
| Ehret | 17.06 | 10.88 |
| Giardina | 33.83 | 15.75 |
| Molaison | 37.60 | 51.86 |
| Ribando | 11.51 | 21.51 |
| Total | 100.00 | 100.00 |
| **District 3 and 4, At large** | | |
| Bertolan | 14.78 | 36.78 |
| Heaslip | 49.13 | 68.44 |
| Treen | 36.09 | −5.23 |
| Total | 100.00 | 99.99 |
| **District 1—Council Member** | | |
| Miller | 74.90 | 88.24 |
| Traffica | 25.10 | 11.76 |
| Total | 100.00 | 100.00 |

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| District 2—Council Member | | |
| Dufrene | 40.28 | 23.42 |
| Eymard | 17.46 | 6.26 |
| Fitchue | .77 | 44.43 |
| Lawson | 35.56 | 24.67 |
| Nobles | 5.93 | 1.22 |
| | | |
| Total | 100.00 | 100.00 |
| District 3—Council Member | | |
| Ackel | 74.28 | 88.69 |
| Maynard | 25.72 | 11.31 |
| | | |
| Total | 100.00 | 100.00 |
| District 4—Council Member | | |
| Chehardy | 10.04 | 96.02 |
| Deviney | 35.53 | 78.41 |
| Dwyer | 8.88 | 35.08 |
| Pilney | 43.47 | −171.61 |
| Raia | .59 | 28.19 |
| Zeringue | 1.50 | 33.91 |
| | | |
| Total | 100.01 | 100.00 |

## 1975 GENERAL

District 3 and 4, At large

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| Heaslip | 57.66 | 101.06 |
| Treen | 42.34 | −1.06 |
| | | |
| Total | 100.00 | 100.00 |
| District 1 and 2, At large | | |
| Giardina | 60.43 | 38.25 |
| Molaison | 39.57 | 61.75 |
| | | |
| Total | 100.00 | 100.00 |
| District 2—Council Member | | |
| Dufrene | 42.68 | 41.53 |
| Lawson | 57.32 | 58.47 |
| | | |
| Total | 100.00 | 100.00 |
| District 4—Council Member | | |
| Deviney | 50.61 | 230.17 |
| Pilney | 49.39 | −130.17 |
| | | |
| Total | 100.00 | 100.00 |

## 1979 PRIMARY

Council Chairman—at large entire parish

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Chehardy | 10.13 | 15.51 |
| Deviney | 33.33 | 4.61 |
| Evans | 35.08 | 34.40 |
| Nicholson | 16.54 | 36.63 |
| C. Schouest | 4.90 | 8.84 |
| | | |
| Total | 99.98 | 99.98 |
| District 1 and 2, At large | | |
| Berry | 4.40 | 4.70 |
| Breaux | 11.57 | 13.13 |
| Caramonta | 13.62 | 12.40 |
| Giardina | 62.17 | 60.16 |
| Schoest | 8.20 | 9.60 |
| | | |
| Total | 99.96 | 99.99 |
| District 3 and 4, At large | | |
| Burke | 12.27 | 19.57 |
| Cole | 5.45 | 2.60 |
| Fasola | 4.27 | 2.55 |

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Hof | 24.23 | 52.81 |
| Hubbell | 6.70 | 1.50 |
| Romano | 26.80 | 22.88 |
| White | 20.16 | −1.905 |
| | | |
| Total | 99.88 | 100.01 |

District 1—Council Member

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Alison | 7.24 | 1.44 |
| Cambre | 5.29 | 6.07 |
| Ford | 4.70 | 2.10 |
| Romero | 17.88 | 10.05 |
| Sacco | 13.62 | 2.83 |
| Trafficano | 6.87 | 6.03 |
| Ward | 44.40 | 71.47 |
| | | |
| Total | 100.00 | 99.99 |

District 2—Council Member

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Fayoard | 5.69 | 2.18 |
| Lawson | 48.41 | 35.61 |
| Monfra | 5.02 | 3.71 |
| Nobles | 7.13 | 9.40 |
| Wallace (black) | .80 | 35.62 |
| Winters | 32.95 | 13.50 |
| | | |
| Total | 100.00 | 100.02 |

District 3—Council Member

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Broussard | 78.49 | 90.50 |
| Blanc | 21.51 | 9.50 |
| | | |
| Total | 100.00 | 100.00 |

District 4—Council Member

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Bertaut | 6.43 | 56.13 |
| Brennan | | |
| Glenn | 2.58 | |
| Hollis | 29.96 | 142.063 |
| Lambert | 16.42 | 368.99 |
| Leitz | | 262.26 |

### 1979 GENERAL

Council Chairman—at large entire parish

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Deviney | 51.46 | 12.09 |
| Evans | 48.53 | 87.91 |
| | | |
| Total | 99.99 | 100.00 |

District 3 and 4, At large

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Hof | 60.85 | 61.54 |
| Romero | 29.15 | 38.46 |
| | | |
| Total | 100.00 | 100.00 |

District 2—Council Member

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Lawson | 61.10 | 57.68 |
| Winters | 38.90 | 42.32 |
| | | |
| Total | 100.00 | 100.00 |

District 4—Council Member

| Candidate | % of White Vote | %Of Black Vote |
|---|---|---|
| Hollis | 57.22 | 9.47 |
| Leitz | 42.78 | 90.53 |
| | | |
| Total | 100.00 | 100.00 |

### 1983 PRIMARY

District 1 and 2, At large

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| Giardina | 81.48 | 85.96 |
| Mitchell | 18.52 | 14.04 |
| | | |
| Total | 100.00 | 100.00 |

District 3 and 4, At large

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| Hild | 38.23 | .64 |

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| Hof | 57.40 | 72.15 |
| Williams | 4.40 | 27.20 |
| | | |
| Total | 100.03 | 99.99 |

District 1—Council Member

| | % of White Vote | % of Black Vote |
|---|---|---|
| Chiasson | 11.45 | 9.02 |
| Adaol | 21.22 | 9.95 |
| Ward | 67.33 | 81.04 |
| | | |
| Total | 100.00 | 100.01 |

District 2—Council Member

| | % of White Vote | % of Black Vote |
|---|---|---|
| Alario | 9.21 | 4.76 |
| Hamilton (black) | 3.74 | 27.44 |
| Lawson | 42.63 | 35.38 |
| Nicholson | 44.42 | 32.41 |
| | | |
| Total | 100.00 | 99.99 |

District 3—Council Member

| | % of White Vote | % of Black Vote |
|---|---|---|
| Gillen | 47.85 | 53.24 |
| Hooper | 52.15 | 46.76 |
| | | |
| Total | 100.00 | 100.00 |

### 1983 GENERAL

District 2—Council Member

| Candidate | % of White Vote | % of Black Vote |
|---|---|---|
| Lawson | 52.14 | 50.31 |
| Nicholson | 47.86 | 49.69 |
| | | |
| Total | 100.00 | 100.00 |
| Parish Turnout | 73.35 % | |
| Parish White Turnout | 74.31 % | |
| Parish Black Turnout | 66.20 % | |

## APPENDIX C

## ELECTIONS ANALYZED BY PROFESSOR ENGSTROM

### Results of Weighted Regression Analyses

| Election | Year | Black Candidate | % of white voters for black Candidate | % of black voters for black Candidate | Correlation Coefficient |
|---|---|---|---|---|---|
| Juvenile Court, Section A | 1987 | Council | 3.1 | 80.8 | .914 |
| Kenner Council, At–Large | 1987 | Richardson | 0.0 | 80.1 | .988 |
| Kenner Chief of Police | 1986 | Austin | 14.7 | 49.1 | .903 |
| Kenner Council At–Large | 1986 | Cade | 12.1 * | 42.6 * | .940 |
| Kenner Council District 1 | 1982 | Irvin | 8.0 | 39.5 | .963 |
| | | Burton | 8.8 | 32.4 | .921 |
| | | Council | 0.0 | 23.9 | .879 |
| Kenner Council Dist. 1 Runoff | 1982 | Irvin | 11.9 | 82.2 | .984 |
| School Board, District 7 | 1984 | Wallace | 8.7 | 57.5 | .759 |
| School Board, District 3 | 1983 | Wilson | 3.2 | 84.2 | .995 |
| School Board, Dist. 3 Runoff | 1983 | Wilson | 18.5 | 93.5 | .981 |
| Constable, 7th Jus.Dist. | 1987 | Wallace | 0.0 | 94.5 | .881 |
| House Dist. 87 | 1983 | Lewis | 0.0 | 60.8 | .998 |

| Election | Year | Black Candidate | % of white voters for black Candidate | % of black voters for black Candidate | Correlation Coefficient |
|---|---|---|---|---|---|
| House Dist. 87 Runoff | 1983 | Lewis | 5.8 | 94.3 | .998 |
| Gretna Chief of Police | 1985 | Wilson | 1.3 | 64.7 | .974 |

\* Figure is for the percentage of whites and blacks signing-in on election day, not the percentage voting in the election for the at-large seats.

### Results of Homogeneous Precinct Analyses

| Election | Year | Black Candidate | % of white voters for black Candidate | % of black voters for black Candidate |
|---|---|---|---|---|
| Juvenile Court, Section A | 1987 | Council | 4.5 | 74.9 |
| Kenner Council, At–Large | 1987 | Richardson | 4.0 | 80.9 |
| Kenner Chief of Police | 1986 | Austin | 15.3 | 50.1 |
| Kenner Council At–Large | 1986 | Cade | 13.0* | 40.0* |
| Kenner Council District 1 | 1982 | Irvin | 7.9 | 36.4 |
| | | Burton | 8.6 | 28.6 |
| | | Council | 2.4 | 32.3 |
| Kenner Council Dist. 1 Runoff | 1982 | Irvin | 15.9 | 88.0 |
| School Board, District 7 | 1984 | Wallace | 10.8 | 61.9 |
| School Board, District 3 | 1983 | Wilson | 5.2 | 84.4 |
| School Board, Dist. 3 Runoff | 1983 | Wilson | 20.8 | 93.0 |
| Constable, 7th Jus.Dist. | 1987 | Wallace | 31.8 | 93.6 |
| House Dist. 87 | 1983 | Lewis | 2.2 | 60.2 |
| House Dist. 87 Runoff | 1983 | Lewis | 7.7 | 93.9 |
| Gretna Chief of Police | 1985 | Wilson | 3.2 | NA |

\* Figure is for the percentage of whites and blacks signing-in on election day, not the percentage voting in the election for the at-large seats.

